*In re* MARRIAGE OF DAWN A. SNOW, Petitioner-Appellent and Cross-Appellee, and WILLIAM A. SNOW, Respondent-Appellee and Cross-Appellant.

Third District    No. 3—00—0369

Opinion filed June 14, 2001.

954

Victoria A. Boone (argued), of Law Offices of Edward R. Jaquays, of Joliet, for appellant.

Roy A. Sabuco (argued) and Michael Renzi, both of Snyder, Sabuco & Beck, P.C., of Joliet, for appellee.

JUSTICE SLATER delivered the opinion of the court:

The petitioner, Dawn A. Snow, appeals from the order of the circuit court of Will County terminating her right to receive maintenance from the respondent, William A. Snow. On appeal, Dawn contends that the trial court erred in finding that she engaged in a continuing, conjugal relationship with another man. On cross-appeal, William argues that the trial court erred in terminating maintenance from the date of his petition rather than the date the cohabitation began. For the following reasons, we affirm the trial court's order granting William's petition. However, we remand this cause for the trial court to determine when Dawn began the cohabitation and to terminate her payments as of that date.

The record reflects that the judgment of dissolution was entered on February 27, 1998. In the judgment, William was ordered to pay $1,800 per month in maintenance to Dawn until May 31, 1999. Thereafter, a reduced amount of maintenance was to be paid pursuant to a schedule set forth in the marital settlement agreement. The terms of the marital settlement agreement, which were incorporated into the judgment of dissolution, also stated that "maintenance shall terminate after the above payments have been made or earlier upon order of court."

On May 14, 1999, William filed a petition to terminate maintenance. In the petition, William alleged that Dawn had been engaged in a continuing conjugal relationship with Jaime Littrell between August 1997 and February 1999.

At the hearing on the petition, Jaime Littrell testified that sometime in 1997 he was living with his mother, who was preparing to move out of state. At that time, Dawn invited him to move into her home. Jaime moved into Dawn's son's old room.

Jaime testified that when he moved into her home, Dawn told him that he did not need to initially pay rent because her husband was paying the mortgage. However, she said that in March 1998 he would have to pay her $300 per month. Jaime said that they had an agreement to split the cost of utilities and groceries. He also maintained the lawn and the pool.

According to Jaime, in March 1998 he began paying rent. He paid the rent in cash because he had no checking account. He said Dawn gave him receipts for the payments, but he was unable to produce any receipts at the hearing.

Jaime also testified that he and Dawn had sexual relations three to four times a week during the year and a half that they lived together. Further, he admitted that on one occasion he secretly videotaped them having sexual relations without Dawn's consent. He described their relationship during that time as "sex partners."

Dawn testified that Jaime lived in her home for a year and a half. She said that she allowed Jaime to live in her home because he had no place to live after his mother moved out of state. According to Dawn, she only offered him one of her bedrooms until he got himself "up on his feet." During that time, he never paid her any rent or contributed toward her mortgage payments. She said Jaime paid for his own groceries and telephone charges but sometimes he would give her money for food, gas, and chemicals for the pool. She also said Jaime did some yard work and work around the pool.

Dawn admitted that while they lived together, she and Jaime socialized about two to three times a month for dinner, a movie, or drinks. They sometimes went out with her friends, but never with his. They exchanged Christmas and birthday presents.

Dawn denied any sexual relationship with Jaime. However, she admitted that they had sexual relations in January 1999 after they had been out together and she had had too much to drink. Finally, Dawn noted that during the time Jaime resided in her home he never paid for any of her personal expenses, they did not co-mingle their funds, and they owned no joint credit cards.

After hearing all the evidence, the trial court found that Jaime's

testimony was more credible than Dawn's. Therefore, it found that William established that Dawn engaged in a continuing conjugal relationship with Jaime within the meaning of the statute. Accordingly, it terminated William's maintenance obligation from the date he filed his petition and ordered Dawn to reimburse William for the overpayment.

On appeal, Dawn argues that the trial court erred in terminating her maintenance because William failed to prove that she and Jaime engaged in a continuing, conjugal relationship.

■ Illinois law provides for termination of maintenance when there is a resident, continuing, conjugal relationship between the maintenance recipient and a third party. 750 ILCS 5/510(c) (West 1998). To prove a continuing, conjugal relationship, an ex-spouse must show that the former spouse is involved in a *de facto* husband and wife relationship. *In re Marriage of Leming*, 227 Ill. App. 3d 154, 590 N.E.2d 1027 (1992). To determine if such a relationship exists, courts have examined the following factors: (1) the length of the relationship; (2) the amount of time the couple spends together; (3) the nature of activities engaged in; (4) the interrelation of their personal affairs; (5) whether they vacation together; and (6) whether they spend holidays together. *In re Marriage of Herrin*, 262 Ill. App. 3d 573, 634 N.E.2d 1168 (1994). A reviewing court gives great deference to the trial court's factual findings because the trial court stands in the best position to weigh the credibility of all the witnesses. *In re Jones*, 285 Ill. App. 3d 8, 673 N.E.2d 703 (1996). Finally, a court of review will not reverse a trial court's finding concerning the existence of a *de facto* relationship unless that finding is contrary to the manifest weight of the evidence. *In re Marriage of Caradonna*, 197 Ill. App. 3d 155, 553 N.E.2d 1161 (1990).

■ Here, Dawn and Jaime lived together for a year and a half. They socialized together frequently and engaged in such dating activities as dinners, movies, and drinks. Although Dawn testified that they did not have a sexual relationship, we defer to the trial court's finding that Jaime's account of their sexual relationship was more credible. They exchanged Christmas and birthday presents. They split household chores, and they socialized with Dawn's friends. Based upon the totality of the circumstances, we find that the trial court's finding of a *de facto* husband-wife relationship between Dawn and Jaime was not against the manifest weight of the evidence. Therefore, we hold that the trial court properly found a continual, conjugal relationship between Dawn and Jaime and granted William's petition to terminate maintenance.

■ On cross-appeal, William argues that the trial court erred in

terminating maintenance from the date of his petition rather than the date the cohabitation began. In support of his contention, he cites to *In re Marriage of Gray*, 314 Ill. App. 3d 249, 731 N.E.2d 942 (2000). In *Gray*, the appellate court held that the triggering period for termination of maintenance is the time the conjugal cohabitation began and not when the petition to terminate maintenance is filed. *Gray*, 314 Ill. App. 3d at 253, 731 N.E.2d at 946. In response, Dawn argues that the term of the settlement agreement that "maintenance shall terminate after the above payments have been made or earlier upon order of the court" is a separate agreement between the parties that precludes application of the "conjugal cohabitation" section of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/510(c) (West 1998)). In the alternative, Dawn contends that the *Gray* case fails to follow well-settled Illinois law.

Section 510(c) of the Act provides as follows:

> "Unless otherwise agreed by the parties in a written agreement set forth in the judgment or otherwise approved by the court, the obligation to pay future maintenance is terminated upon the death of either party, or the remarriage of the party receiving maintenance, or if the party receiving maintenance cohabits with another person on a resident, continuing conjugal basis." 750 ILCS 5/510(c) (West 1998).

We reject Dawn's argument that the terms of the settlement agreement constitute a separate agreement that only allows maintenance to be terminated upon completion of payment or the entry of a court order. We do not read that section as limiting the termination of maintenance to only those two instances. Therefore, we find that the "conjugal cohabitation" section of the Act applies in this case. Further, we agree with *In re Marriage of Gray* that the triggering period for termination of maintenance is the time the conjugal cohabitation began and not when the petition to terminate maintenance is filed. *Gray*, 314 Ill. App. 3d at 253, 731 N.E.2d at 946. Therefore, we hold that the trial court erred in terminating William's maintenance obligations from the time he filed his petition. Accordingly, we remand this cause for the trial court to determine when Dawn began the cohabitation and to terminate her payments as of that date.

The judgment of the circuit court of Will County is affirmed in part and remanded in part.

Affirmed in part; remanded in part.

BRESLIN and McDADE, JJ., concur.