No. 2--04--0480

______________________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

______________________________________________________________________________

In re
 MARRIAGE OF ) Appeal from the Circuit Court

SUSAN E. SUNDAY, ) of Winnebago County.

)

Petitioner-Appellant, )

) No. 01--D--804

and )

)

RONALD E. SUNDAY, ) Honorable

) Brian Dean Shore,

Respondent-Appellee. ) Judge, Presiding.

______________________________________________________________________________

PRESIDING JUSTICE O'MALLEY delivered the opinion of the court:

Petitioner, Susan E. Sunday, appeals the judgment of the circuit court of Winnebago County granting respondent Ronald E. Sunday's motion to terminate maintenance.  Petitioner argues that the trial court's determination that she was cohabiting with Reginald Baker on a resident, continuing, conjugal basis (see 750 ILCS 5/510(c) (West 2002)) was against the manifest weight of the evidence.  We agree and reverse.

The following facts are taken from the record on appeal.  On February 13, 1972, the parties were married.  The parties had two children, who were grown at the time dissolution proceedings were instituted.  On August 16, 2001, the trial court entered an order dissolving the marriage and incorporating the parties' marital settlement agreement into the judgment of dissolution.  The marital settlement agreement provided, among other things, that respondent would pay petitioner $200 per month until the trial court's review, set to occur four years after the judgment of dissolution.  

Following the dissolution, the parties each petitioned for an order of protection against the other.  The trial court granted petitioner's petition for an order of protection, and on October 2, 2003, the order of protection was extended for another two years.

On November 11, 2003, respondent filed a petition to terminate maintenance, alleging that petitioner was cohabiting with Baker on a resident, continuing conjugal basis.  On March 23, 2004, the trial court held a hearing on respondent's petition to terminate, during which the following evidence was adduced.

In June 2003, petitioner met Baker and, soon after, petitioner and Baker began a dating relationship, which included sexual relations and which was ongoing at the time of the hearing.  Petitioner testified that, during this relationship, she resided continually on Ninth Avenue.  Baker testified that, during his relationship with petitioner, he resided continually at Sun Valley Terrace, where he maintained an apartment.  In addition to renting the apartment, Baker maintained utility services, including phone and electric.  

Baker and petitioner testified that Baker would often stay overnight at petitioner's house.  Each agreed that the frequency of his stays at certain times reached four to five nights a week.  Both Baker and petitioner testified, however, that sometimes Baker would stay overnight only one or two times a week.  Petitioner explained that she had Baker stay overnight because she was frightened of respondent.

Petitioner testified that respondent resided in a house across the street from hers, and that he harassed not only her and Baker, but any other male guest she invited into her home.  Specifically, she testified that respondent created displays in his front window, including a Confederate flag, mannequins on which he would place cards bearing messages, such as "$200 [per] w[ee]k.  22 months left to pay," or mannequins that he would arrange in sexually suggestive poses.  Additionally, petitioner testified that respondent placed signs bearing the inscription, "dope house closed," on her property and even screwed one such sign to a tree in her front yard.  Petitioner also testified that respondent would observe her house with binoculars and make loud noises, such as playing his stereo at full volume, blowing whistles, or banging a cymbal when she was present.  Petitioner testified that, following the divorce, respondent would engage in this harassing behavior for awhile, then stop, only to begin the harassing behavior anew.  Baker also testified to confrontations with respondent during which respondent attempted to intimidate Baker.

Petitioner explained that, as a result of this behavior, she was afraid of respondent.  Because of this, petitioner asked Baker to stay overnight more frequently than she otherwise would have, specifically during October 2003, when respondent retained a private investigator to place petitioner and Baker under surveillance.  

This testimony was offered to counter testimony of respondent's private investigator, Robert Sadler.  Sadler testified that, during the last week of October 2003, he observed Baker's car parked overnight at petitioner's house for five nights.  Sadler testified that during that week he observed that  Baker's car had been moved only once.  Further, he testified that he did not see either Baker or petitioner in or about the house, as all of the blinds were drawn shut.  

Regarding the activities in which Baker and petitioner engaged, petitioner testified that she had a high-quality exercise room that Baker, among others, used.  In addition to Baker, petitioner's sister and three nieces used the exercise room regularly.  Baker testified that he tried to exercise early in the morning, so even if he returned to his apartment the night before, he would arrive at petitioner's house early in the morning.

Petitioner testified that she did not cook meals for Baker; rather, she made a daily meal for her grandson and, if there were leftovers, Baker was free to eat them whenever he chose.  Under questioning from respondent's attorney, Baker agreed that he ate up to a meal a day at petitioner's house.  Baker testified that, when he would eat at petitioner's home, he would generally replace the food or other items he consumed.  Likewise, if Baker used petitioner's car, he would give her money for gas.  Petitioner and Baker both testified that Baker had keys to petitioner's car and house and was given leave to come into the house whenever he wanted.

Petitioner and Baker testified that Baker kept no furniture, personal property, or clothes at petitioner's house.  Petitioner testified that, on occasion, she would wash Baker's work pants along with her dirty clothes.  Petitioner did not otherwise do Baker's laundry.  Baker testified that, at petitioner's home, he mowed the lawn, raked leaves, took out garbage, and shoveled the walk after snowstorms.  He also testified that he did not do these chores regularly, but had done them only once or twice each.  Baker testified that petitioner regularly cut her own grass.

Petitioner and Baker testified that they did not have any intertwined financial dealings.  They held no joint debts, bank accounts, or property.  Neither had made the other a beneficiary on retirement accounts or insurance policies.  Petitioner and Baker both testified that, to avoid having a bank account attached to satisfy an outstanding judgment against her, petitioner maintained no bank account and operated on a cash-only basis.  

Petitioner testified that she made about $100 per week working as a personal trainer, hair dresser, and house cleaner.  Baker testified that he made about $300 to $350 per week as a server at a restaurant and as a professional dancer.  Both denied that they contributed money to help support the other.

Petitioner and Baker have professed their love for each other, notably on Valentine's Day cards admitted into evidence, but they denied that they have talked of marriage.  Instead, each maintained that he or she wanted his or her personal space and was satisfied in their current relationship.  Both admitted that they had spent all of the holidays together since they met, but they had not taken vacations together.  The evidence showed that neither had gone on a vacation at any time since they met.

Following the presentation of evidence, the trial court made a number of factual findings.  The trial court found that petitioner and Baker were engaged in a sexual relationship, which began as early as June 2003.  The court determined that Baker ate meals with petitioner on a daily basis.  The court also determined that Baker and petitioner had professed their love for each other as early as July 2003, and had been together for every holiday since July 2003.  It determined that they did not vacation together, but that there was no evidence that either of them took any vacation during that time.  The trial court determined that there was no evidence that Baker and petitioner held any joint bank accounts, but it attributed that lack to petitioner's admitted creditor problems.  The trial court also found that petitioner and Baker shared household and domestic chores and shared keys to petitioner's house and to each other's vehicles.  The trial court made no finding concerning petitioner's and Baker's expenses or about Baker's income, other than to note that it was small.  Last, the court stated: "That while the [c]ourt finds the evidence concerning [respondent's] conduct disturbing, it does not rise to the level of a clear reason why Mr. Baker was residing at the residence in light of the fact that he continued to live there after the conduct ceased."  The trial court held that, beginning in November 2003, petitioner and Baker were cohabiting on a "resident, continuing, conjugal basis."  Petitioner timely appeals.  

On appeal, petitioner contends that the trial court's determination that she and Baker were cohabiting on a resident, continuing, conjugal basis was against the manifest weight of the evidence.  Petitioner contends that the trial court erred in determining both that Baker was residing at her house and that they were cohabiting.  We find little in petitioner's arguments to support her attempt to bifurcate her argument into residency and conjugal cohabitation; rather, they are facets of the singular contention that, under the totality of the circumstances adduced into evidence, the trial court's determination that petitioner and Baker were cohabiting on a resident, continuing, conjugal basis was against the manifest weight of the evidence.

We begin with a brief review of the applicable law and standard of review.  Illinois law provides that a party's maintenance may be terminated when it is shown that the party is engaged in a resident, continuing, conjugal relationship with a third party.  750 ILCS 5/510(c) (West 2002); 
In re Marriage of Snow
, 322 Ill. App. 3d 953, 956 (2001).  To prove the existence of a resident,  continuing, conjugal relationship, one ex-spouse must show that the other is involved in a 
de facto
 husband and wife relationship with a third party.  Courts will examine this issue by considering the following factors:  (1) the length of the relationship; (2) the amount of time the couple spends together; (3) the nature of activities engaged in; (4) the interrelation of their personal affairs; (5) whether they vacation together; and (6) whether they spend holidays together.  
Snow
, 322 Ill. App. 3d at 956.  The purpose underlying the statutory termination of maintenance when the recipient spouse cohabits with a third party is to remedy the inequity created when the recipient spouse becomes involved in a husband-wife relationship but does not formalize the relationship, so that he or she can continue to receive maintenance from his or her ex-spouse.  
In re Marriage of Arvin
, 184 Ill. App. 3d 644, 649 (1989).  Each case seeking a termination of maintenance based on the recipient spouse's conjugal cohabitation rests on its own unique set of facts (
In re Marriage of Sappington
, 106 Ill. 2d 456, 466 (1985)), and to preserve the primacy of the trial court's position in finding those unique facts, a court of review will not disturb the trial court's determination concerning the existence of a 
de facto
 husband-wife relationship unless that determination is contrary to the manifest weight of the evidence.  
Snow
, 322 Ill. App. 3d at 956.

With these principles in mind, we turn to the evidence in the record.  The evidence showed that petitioner and Baker first met in June 2003.  At the time of the hearing, therefore, petitioner and Baker's relationship had lasted nine months.  We note as well that the trial court found that they began cohabiting in November 2003, a period of only four months before the hearing.  We find this period to be extremely brief, especially in light of the other termination-of-maintenance cases cited by the parties.  In all cases where conjugal cohabitation has been found, the relationships have lasted longer than petitioner's and Baker's.   For instance, in 
Snow
, 322 Ill. App. 3d at 955, the spouse receiving maintenance had lived with a third party for a year and a half.  In 
In re Marriage of Toole
, 273 Ill. App. 3d 607, 610 (1995), the recipient spouse had lived with a third party for about four years at the time the petition to terminate maintenance was heard.  In 
In re Marriage of Herrin
, 262 Ill. App. 3d 573, 574 (1994), the recipient spouse maintained a relationship for about 2½ years before the hearing to terminate maintenance.  In 
Hall v. Hall
, 25 Ill. App. 3d 524, 526 (1975), the relationship at issue spanned about two years.  In all of these cases, the relationship alleged to be resident, continuing, and conjugal lasted significantly longer than petitioner's and Baker's.  Indeed, the length of the relationship is a proxy to help determine whether the new relationship is in fact a substitute for the marital relationship.  
In re Marriage of Weisbruch
, 304 Ill. App. 3d 99, 105 (1999).

Respondent points to 
In re Marriage of Roofe
, 122 Ill. App. 3d 56 (1984), as illustrative of an extremely short time in which a resident, continuing, conjugal relationship was established.  There, the recipient spouse had initiated a relationship with a third party nine months before moving in with him and had resided with him for about six weeks before the hearing on the petition to modify maintenance.  
Roofe
, 122 Ill. App. 3d at 57.  The court found cohabitation because the recipient spouse abandoned her former residence, moved furniture and personal possessions into the third party's house, discussed marriage with him, and planned to continue to reside in the new home indefinitely.  
Roofe
, 122 Ill. App. 3d at 59.  Here, while the relationship has lasted about the same length of time, there is no evidence that either petitioner or Baker has abandoned his or her residence for that of the other.  Likewise, there is no evidence that Baker has transferred any furniture or possessions to petitioner's house.  These differences serve to distinguish 
Roofe
 from this case and to undermine the guidance it offers to interpret the evidence in this case.  We find, therefore, that the length-of-relationship factor strongly favors a finding of no conjugal cohabitation in this case.

Next, we consider the amount of time the couple spends together.  The evidence showed that Baker was a frequent overnight guest of petitioner's, sometimes staying overnight as frequently as five nights a week.  Both petitioner and Baker explained that this was due to petitioner's fear of respondent.  Indeed, extensive evidence was presented regarding respondent's threatening and annoying behavior, and the patterns through which he exhibited his behavior.  It is uncontradicted that respondent engaged in behavior calculated to harass and demean petitioner in the eyes of the neighborhood.  Additionally, respondent confronted Baker and attempted to intimidate him on at least one occasion.  It is also uncontradicted that respondent would engage in these activities, cease them for some time, and then resume them later.  As a result of respondent's activities, which included invading petitioner's property to attach a derogatory placard onto one of her trees, petitioner testified that she was fearful of respondent and asked Baker to stay overnight in order to provide protection.

The trial court acknowledged this evidence in passing, characterizing respondent's behavior as "disturbing," but inappropriately minimized its significance.  We find that petitioner's explanation for the frequency of Baker's overnight visits is reasonable and compelling, and we do not understand why the trial court chose effectively to ignore it.  As a result of effectively ignoring this important and uncontradicted evidence, the trial court miscalculated the weight to accord the amount-of-time factor.  We hold that this factor should be accorded relatively little weight in determining the existence of a conjugal and cohabiting relationship in this case, because respondent's actions have caused this factor to appear artificially inflated.

Next, we consider the nature of the activities engaged in by petitioner and Baker.  There was little testimony concerning how petitioner and Baker spent their time together.  Baker testified that he would go to petitioner's house to use her exercise equipment.  Petitioner testified that she possessed high-quality equipment and that she earned some of her income acting as a personal trainer.  This information would tend to undercut the conclusion that petitioner and Baker were involved in a conjugal relationship.

There was, however, testimony that Baker performed some chores around petitioner's house, such as mowing the lawn, shoveling snow, raking leaves, and taking out the garbage.  Baker stated that he did not perform any of these chores regularly and that petitioner usually cut her own grass.  Instead, Baker would merely help out with the chores on occasion.  Likewise, petitioner testified that, while she would occasionally wash Baker's pants when the opportunity presented itself, she did not otherwise do his laundry.  She also testified that Baker would eat some food at her house, but that she did not prepare it for him; rather, she prepared the food for her grandson, and Baker was welcome to any leftovers he was able to find.  We hold that the evidence paints a picture of limited domesticity.  Baker and petitioner engaged in activities expected in a conjugal relationship, but not with the frequency expected or required in such a relationship.  The trial court completely ignored in its findings the uncontradicted qualifying testimony offered by Baker and petitioner regarding their activities.  The trial court should have found this factor to favor only slightly a finding of a conjugal relationship.  

Next, we consider the interrelationship of petitioner's and Baker's personal affairs.  The evidence was uncontradicted that they did not intermingle any funds.  Further, neither paid any money towards the other's household expenses.  Baker testified that he would occasionally buy food for petitioner as a recompense for that which he had consumed as leftovers.  Also, he testified that he would replenish gas in petitioner's car on those occasions that he would use it.  This factor very strongly supports a finding that Baker and petitioner were not engaged in a conjugal relationship.  

It is clear that this factor is very significant in determining the existence of a conjugal relationship.  Indeed, 
Sappington
 acknowledged that a conjugal relationship mimics the economic aspects of a marriage.  
Sappington
, 106 Ill. 2d at 467.  Subsequent cases have also emphasized the importance of the economic interrelation of a couple when determining whether a conjugal relationship exists.  See, 
e.g.
, 
Weisbruch
, 304 Ill. App. 3d at 101-02 (conjugal relationship found where spouse and third party had joint bank accounts, loaned money to each other, purchased home together, and named each other beneficiary of retirements plans and insurance); 
Toole
, 273 Ill. App. 3d at 612 (conjugal relationship found where spouse and third party "shared meals, bank accounts, household chores, and credit accounts"); 
Herrin
, 262 Ill. App. 3d at 577 (conjugal relationship found where spouse supported third party by feeding him, allowing him to use her car, and paying for third party's expenses, including child support); 
Arvin
, 184 Ill. App. 3d at 649-50 (no conjugal relationship found where no evidence was presented showing that either spouse or third party paid any of the other's expenses, and they did not possess a joint bank account or commingle their funds).

Once again, the trial court inappropriately minimized the uncontradicted evidence that showed that petitioner and Baker maintained separate households and separate finances.  There was no evidence showing that either petitioner or Baker had made the other a beneficiary of any employment benefits or insurance, had drafted wills in favor of the other, or otherwise tried to intertwine their economic situations.  The trial court noted that petitioner operated on a cash-only basis, but even if it was not her habit to maintain a bank account, there was no evidence that they purchased any significant assets jointly or otherwise commingled their funds.  Further, the evidence was uncontradicted that neither petitioner nor Baker paid or helped to pay any of the other's expenses.  Based on the evidence showing the complete separation of petitioner's and Baker's economic interests, the trial court should have weighed this factor strongly against finding a conjugal relationship.

The final factors concern vacationing and holidays.  The evidence showed that neither petitioner nor Baker had taken a vacation during the relevant time period, so this factor was properly ignored by the trial court.  The evidence also showed that Baker and petitioner had spent all of the holidays together.  The trial court again properly interpreted this factor as favoring a finding of a conjugal relationship.  

The foregoing analysis demonstrates that the trial court misconstrued three of the factors used to interpret the totality of the circumstances:  the length of the relationship, the amount of time the couple spends together, and the economic interrelationship of the couple.  As a result of these errors, the trial court found that respondent had demonstrated the existence of a conjugal relationship.  However, we hold that the trial court's determination was against the manifest weight of the evidence because the trial court improperly weighed important and uncontradicted evidence.  Instead, based on the foregoing analysis, the opposite conclusion, that Baker and petitioner had not established a conjugal relationship, was clearly apparent.  Accordingly, we reverse the judgment of the trial court as being against the manifest weight of the evidence.

For the foregoing reasons, the judgment of the circuit court of Winnebago County is reversed.

Reversed.

McLAREN and GROMETER, JJ., concur.