# Illinois Official Reports

## Appellate Court

---

### *In re Marriage of Churchill*, 2019 IL App (3d) 180208

---

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF AMY B. CHURCHILL, Petitioner-Appellee, and JOHN CHURCHILL, Respondent-Appellant. |
| District & No. | Third District<br>Docket No. 3-18-0208 |
| Filed | April 29, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Tazewell County, No. 16-D-397; the Hon. Timothy J. Cusack, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Mitch M. Gilfillan, of Quinn, Johnston, Henderson, Pretorius & Cerulo, of Peoria, for appellant.<br><br>Brian J. Seckler, of Parker & Parker, of Peoria, for appellee. |
| Panel | JUSTICE O'BRIEN delivered the judgment of the court, with opinion.<br>Justices Carter and McDade concurred in the judgment and opinion. |

**OPINION**

¶ 1    Respondent John Churchill filed a petition to terminate maintenance he was obligated to pay to his former spouse, petitioner Amy Churchill, alleging that she was cohabitating with another man. The trial court denied John's petition. He appealed the ruling as well as the trial court's award of permanent maintenance to Amy. We affirm.

¶ 2    FACTS

¶ 3    Petitioner Amy Churchill and respondent John Churchill were married on March 27, 1999, and had two children, born September 7, 1999, and October 18, 2002. Amy filed a petition for dissolution of the marriage and for an order of protection on September 27, 2016. The trial court granted Amy temporary relief in February 2017, awarding her temporary monthly child support of $6040 and maintenance of $5000 and entering an order of protection. The court appointed a guardian *ad litem* (GAL) to represent the children.

¶ 4    John filed a petition to terminate temporary maintenance in October 2017, alleging Amy was cohabitating with her boyfriend, Jared Fogle. In December 2017, a trial took place on John's petition to terminate maintenance at which the following witnesses and evidence were presented. Amy testified she had been a homemaker throughout the marriage because John wanted her to stay at home. She had a part-time temporary job for several years at which she earned $8.59 per hour. She quit the job because she and John were building a house. At the time of trial, she had not worked for four years. She had a high school diploma and two years post-high school classes. She met her boyfriend, Jared, in November 2016. She had planned to see him with a group of friends on New Year's Eve 2016 but cancelled because of illness. Jared visited her when she was hospitalized in January 2017. They went on their first date on Valentine's Day 2017, and had engaged in sexual intercourse since February 2017. Amy estimated Jared spent the night at her house approximately seven times between February and April 2017, with the longest period being Friday through Sunday. Jared kept a sweatshirt and a pair of slides at the marital house on Tara Trace and slides at her rental place on North Morton Avenue. He helped move her outdoor furniture from the house on Tara Trace to the North Morton Avenue house, but she hired movers for the majority of her items.

¶ 5    Amy spent a lot of time with Jared, including going to the movies once and bowling several times with her children. She and Jared also went to the casino a few times. Jared helped her son with his Spanish homework because Jared spoke the language. Jared also came to her sons' sporting events. He used the grill at her house at her request on two occasions and took out the trash twice. He mowed the lawn and edged once when there was a showing scheduled. Jared washed his clothes at her house from time to time and put up a shelf for her son, but he did not assist her with household chores. She accepted packages for him delivered to her house, including several addressed to Amy Fogle. Amy explained that Jared used Amy Fogle as a code so she would know to wait to open the package until he was with her. She vacationed to Las Vegas with Jared to celebrate his birthday. She paid her share of the trip. They also traveled to Macomb for family gatherings. She bought Jared a ring when his grandfather died, but he was uncomfortable with it because of its symbolism. She and Jared had not discussed marriage, and she stated that Jared may not be in her life forever. Amy acknowledged Jared would likely move back to Texas and their relationship would end. She was not interested in marrying again.

¶ 6        Jared testified that he co-owned and operated a hail damage repair business with his brother. The work required him to move from place to place. He worked in Morton from November 2016 to April 2017. Jared moved the business to Canton in April 2017, staying there until June 2017, when he moved the business to Iowa. In October 2017, he moved the business to Missouri. His permanent home address was in Texas. His time in Morton was always meant to be temporary. While working in Morton, Jared set up an office and converted a room there into living quarters. Amy would visit him there for lunch on occasion. Although he spent a few nights at Amy's house, he stayed primarily at his converted living space. He parked his truck in the garage at the Tara Trace house three or four times when the weather was bad. After Amy moved to North Morton Avenue, he stayed there two or three nights each month. He never had a key to either residence. He did not keep a toothbrush at Amy's house. He had items delivered to Amy's house because he did not want them left unattended at the business.

¶ 7        John testified as to Amy's spending habits during the marriage and after their separation and divorce. It was his understanding from a phone call he overheard between one of his sons and Amy that she was dating Jared at Christmastime 2016.

¶ 8        The GAL testified that the children told her Jared did not live with them but spent four days at their house approximately every other weekend. Jared was treated as a guest. One son found the idea of his mother marrying Jared humorous and said his relationship with his girlfriend was more serious than Amy and Jared's relationship. He called the ring Jared gave Amy a mother's ring and not a promise ring. Both children thought John was trying to trap Amy.

¶ 9        A sales associate from Rogers and Holland testified that Jared and Amy were authorized users on each other's account, which was done for convenience. Jared used Amy's address for a ring he bought her. The ring was described as a double-heart alexandrite ring with birthstones. Amy bought Jared a ring that was a wedding band. The men's wedding rings were less flashy than the regular men's rings, which included diamonds and other decorations on them.

¶ 10       A private investigator hired by John testified that he began investigating Amy in February 2017 to determine John's claims of cohabitation. He conducted surveillance of Amy's house and Jared's business. He could not say that Jared ever spent the night at Amy's house. After the petition to terminate was filed, Amy's Facebook page was made private, and he could no longer access it. He had used Facebook to find a lot of pictures documenting her relationship with Jared, which were used as exhibits at trial. His investigation continued until October 2017.

¶ 11       An employee of John who passed the marital house on her way to work testified that she had seen a black truck at the house between 7:30 a.m. and 8 a.m. in October 2016 but could not identify it as Jared's truck.

¶ 12       Amy's father testified that he spent time at Amy's house in the fall of 2016 and occasionally spent the night. He drove a black Yukon.

¶ 13       Following the trial, the court entered a bifurcated judgment of dissolution on December 14, 2017. The court entered an order incorporating the parties' marital settlement agreement in January 2018, which resolved all issues except maintenance, child support, and uncovered medical expenses. In April 2018, the trial court entered an order denying John's petition to terminate maintenance. In doing so, the court made specific findings regarding the factors

concerning cohabitation that indicated Amy and Jared were not in a resident, continuing conjugal relationship. The trial court also made specific findings regarding the statutory maintenance factors and awarded Amy permanent maintenance in the amount of $10,000 per month. John appealed.

¶ 14                                ANALYSIS

¶ 15    John presents two issues on appeal: whether the trial court erred in denying his petition to terminate maintenance and in awarding permanent maintenance.

¶ 16    We start with John's challenge to the trial court's denial of his petition to terminate maintenance. John argues that he established that Amy was cohabitating with Jared, necessitating the termination of maintenance, and that the trial court should have granted his petition.

¶ 17    A former spouse's obligation to pay maintenance will terminate when the former spouse "cohabits with another person on a resident, continuing conjugal basis." 750 ILCS 5/510(c) (West 2016). The court considers the following nonexhaustive factors to determine whether a party is engaged in a *de facto* marriage: (1) the length of the relationship, (2) the amount of time the former spouse and new partner spend together, (3) the nature of the activities in which they participate, (4) the interrelation of their personal affairs, and whether they (5) vacation and (6) spend holidays together. *In re Marriage of Herrin*, 262 Ill. App. 3d 573, 577 (1994). Other factors include the effect the relationship has on the recipient former spouse's financial need for maintenance and the intended permanence or mutual commitment to the relationship. *In re Marriage of Bramson*, 83 Ill. App. 3d 657, 663 (1980); *In re Marriage of Miller*, 2015 IL App (2d) 140530, ¶ 48. As opposed to an intimate dating relationship, a *de facto* marriage involves a deeper commitment, permanence and partnership. *Miller*, 2015 IL App (2d) 140530, ¶ 51. The spouse seeking termination of maintenance bears the burden of establishing a *de facto* marriage relationship. *In re Marriage of Thornton*, 373 Ill. App. 3d 200, 208 (2007). A reviewing court will not reverse a trial court's finding that a *de facto* marriage exists unless the finding is against the manifest weight of the evidence. *In re Marriage of Toole*, 273 Ill. App. 3d 607, 611-12 (1995). We will not reverse an order terminating maintenance unless it was an abuse of discretion. *In re Marriage of Bernay*, 2017 IL App (2d) 160583, ¶ 13.

¶ 18    The trial court found that (1) Amy and Jared had been in a relationship between 8 and 12 months; they met after Jared moved to the area in November 2016 and began dating in February 2017; (2) John's private investigator could not find definitive evidence that Jared stayed at Amy's house for a 37-week period from February 2017 to November 2017, although Amy admitted Jared stayed occasionally during that period; Jared kept separate living quarters with his brother at their commercial business; Jared did not change his address to Amy's house or move in any furniture or personal belongings; (3) Amy and Jared spent significant time together as typical of a new relationship; (4) the relationship was sexual; (5) Jared did not share in Amy's household chores, although he assisted her on a couple of occasions; (6) Amy and Jared did not have any joint accounts or commingle their finances; (7) they did not own any joint property; (8) they each paid their own expenses; (9) neither provided for each other in their wills or estate planning; (10) Amy and Jared vacationed and spent holidays together, which was reflective of the initial bloom of the relationship but did not translate into a *de facto* marriage; (11) Jared exchanged gifts with Amy and her sons,

- 4 -

which was normal dating behavior. The court also rejected John's claims that the rings Amy and Jared bought each other were engagement rings, finding the characterization of the rings was disputed and there was no other evidence of an engagement; and (12) Amy acknowledged the parties discussed marriage, said she was not interested in remarrying, and told Jared the same; he said they talked about moving to Texas but did not pursue the plan.

¶ 19       The findings made by the trial court establish that Amy and Jared were involved in an intimate dating relationship and that it lacked the permanence of a *de facto* marriage. Nothing John argues changes that result. John's reliance on *In re Marriage of Walther*, 2018 IL App (3d) 170289, *In re Marriage of Snow*, 322 Ill. App. 3d 953 (2001), and *In re Marriage of Sappington*, 106 Ill. 2d 456 (1985), is misplaced. In those cases, there was evidence the ex-spouse and the new partner lived together. In *Snow*, this court found termination of maintenance was appropriate where the ex-spouse's boyfriend moved into her house and lived there for a year and a half. *Snow*, 322 Ill. App. 3d at 955. In *Sappington*, the ex-spouse and her boyfriend lived together in the marital home for more than two years. *Sappington*, 106 Ill. 2d at 459-60.

¶ 20       In *Walther*, this court determined the former wife was cohabiting on a resident, continuing conjugal basis and granted the former husband's petition to terminate maintenance. *Walther*, 2018 IL App (3d) 170289, ¶ 33. The *Walther* facts established that the former wife slept at her boyfriend's house every night for nearly a year. *Id.* ¶ 27. The former wife's daughter also lived at the boyfriend's house, sharing a room with his daughter. *Id.* ¶ 30. The former wife stored her clothes at the boyfriend's house, bought groceries and cooked for her boyfriend's family, traveled with her boyfriend, and referred to a picture of her, him, and each of their daughters as a family. *Id.* ¶ 24. The former wife maintained a one-bedroom apartment in her own name, which was sparsely furnished. *Id.* ¶ 7. She used the apartment address as her official address, with her bank statements and utility bills mailed there. *Id.* ¶ 18. She also used the address for her driver's license, vehicle registration, and her daughter's school registration. *Id.*

¶ 21       The circumstances in *Walther* differ substantially from the instant case. Amy and Jared met when he was in the area working and began dating. In contrast, in *Walther*, the former wife had reconnected with a childhood friend after she and her husband separated and she eventually moved back to her hometown, where her friend still lived. *Id.* ¶¶ 5-7. Although she rented an apartment, the former wife admitted she spent every night at her friend's house. *Id.* ¶ 27. Here, there was no evidence Jared lived with Amy. He did not store clothes at Amy's house other than a sweatshirt and pair of shoes and did not move in any of his personal belongings. John's investigator was not able to discover that Jared spent the night at Amy's house at all during a seven-month period of surveillance, although Jared and Amy acknowledged that he spent some nights at her house, estimating several per month. Amy's sons told the GAL that Jared did not live with them but often spent every other weekend there. At most, Jared stayed with Amy for a long weekend. The nature of Jared's business was such that he moved around to where the work was located. After he met Amy and worked in the Morton area, he moved the business to Canton, then to Missouri. Jared lived with his brother at their business locations while in Illinois. He maintained his permanent home in Texas.

¶ 22       Amy and Jared did not share finances or commingle the daily aspects of their lives. Jared participated in some activities with Amy's children but did not assume a role as a father.

Unlike the wife in *Walther*, he did not participate in the day-to-day living activities of Amy's household. Jared did not cook, clean, or buy groceries for Amy and her children and Amy did not do Jared's laundry, buy his groceries, or prepare his meals. See *id.* ¶ 29. He did not have a key or unfettered access to either of Amy's houses. See *id.* Jared and Amy spent significant amounts of time together at the beginning of their relationship as was typical but neither of them anticipated a future together or indicated the relationship was permanent. Moreover, as Jared moved out of the area for work, it followed that their day-to-day involvement decreased. Amy's son considered his high school relationship with his girlfriend more serious than his mother and Jared's relationship.

¶ 23     Based on the evidence presented, John failed to establish that Amy was engaged in a resident, continuing conjugal relationship with Jared. His involvement in Amy's life and with her children reflected an intimate dating relationship but did not rise to the level of a *de facto* marriage. We find the trial court did not err when it denied John's petition to terminate maintenance.

¶ 24     The second issue is whether the trial court erred when it made the maintenance award permanent. John does not challenge that Amy was entitled to maintenance but argues it should be limited to 14 years as set forth in the maintenance guidelines and the award as permanent was not warranted. John filed his petition to terminate maintenance based on the award of temporary maintenance prior to the court's determination of maintenance in the judgment of dissolution.

¶ 25     The guidelines provide that for parties with a combined income of less than $500,000, the duration of maintenance is to be determined according to a formula based on the length of the marriage. 750 ILCS 5/504(b-1)(1)(B) (West Supp. 2017). For maintenance that does not fall under the guidelines, the court must consider the statutory factors. *Id.* § 504(b-1)(2). These factors include (1) the parties' income and property; (2) their needs; (3) each party's realistic earning potential, both current and future; (4) impairment to the earning potential of the party seeking maintenance as a result of staying home to raise the children or run the household; (5) any impairment to the earning potential of the spouse from whom maintenance is sought; (6) the amount of time necessary for the recipient spouse to acquire appropriate training and education to support herself and whether she can support herself; (7) the parties' standard of living established in the marriage; (8) the marriage's duration; (9) "the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and the needs of each of the parties"; (10) all sources of income; (11) tax consequences from the property division on the parties' economic circumstances; (12) contribution by the spouse seeking maintenance to the other spouse's education, training, career or career potential, or license; (13) any valid agreement of the parties; and (14) any other factor found to be just and equitable. *Id.* § 504(a)(1)-(14).

¶ 26     Permanent maintenance is appropriate where the spouse receiving it is not employable at a level to allow her to live at the standard of living established during the marriage or is not employable at all. *In re Marriage of Harms*, 2018 IL App (5th) 160472, ¶ 45. Permanent maintenance may be warranted in a lengthy marriage where the recipient spouse devoted his or her time to raise the children. *In re Marriage of Culp*, 341 Ill. App. 3d 390, 398 (2003). This court reviews a trial court's decision to award permanent maintenance for an abuse of discretion. *In re Marriage of Dunseth*, 260 Ill. App. 3d 816, 833 (1994).

¶ 27    The statutory maintenance guidelines do not apply here where John's income was greater than $500,000 per year. The court set forth the statutory factors justifying maintenance, which reflected the need for the award to be permanent. At the time of the dissolution, Amy was 49 years old, with a high school diploma and some college coursework. She had not worked outside the home throughout the marriage except for a 10-hour per week, hourly-wage position that she held for several years. In contrast, during the marriage "John cultivated his business." He enjoyed a brighter financial future, with past earnings over $500,000 annually from a business he owned and grew with Amy's assistance at home. The court noted the parties' "lavish standard of living" and personal property in excess of $1.4 million. The marriage was just over 17 years when Amy filed for dissolution. The parties' property division was equal with Amy receiving non-liquid assets while John retained his earning capability through the business in addition to the non-liquid assets he was awarded. Both parties listed monthly expenses that exceeded their income but John had a regular and ongoing opportunity to earn income while Amy's prospects were limited and would not amount to wages sufficient to maintain her lifestyle as established during the marriage. We find the trial court's award of permanent maintenance in the amount of $10,000 per month was not an abuse of discretion.

¶ 28                                                    CONCLUSION

¶ 29    For the foregoing reasons, the judgment of the circuit court of Tazewell County is affirmed.

¶ 30    Affirmed.