**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 190118-U

Order filed April 9, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| | ) | of the 14th Judicial Circuit, |
| JULIA E. BROOKS, | ) | Whiteside County, Illinois. |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | Appeal No. 3-19-0118 |
| and | ) | Circuit No. 15-D-70 |
| | ) | |
| BRUCE A. BROOKS, | ) | |
| | ) | Honorable Patricia Ann Senneff, |
| Respondent-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE SCHMIDT delivered the judgment of the court.
Justices Holdridge concurred in the judgment.
Justice McDade dissented.

**ORDER**

¶ 1    *Held*: The circuit court properly found that respondent engaged in a *de facto* marriage thereby terminating maintenance.

¶ 2    Petitioner, Julia E. Brooks, filed for divorce from respondent, Bruce A. Brooks, in 2015. The circuit court entered a judgment for dissolution in 2016. A supplemental judgment found an award of maintenance to Julia appropriate. In December 2017, Bruce filed a petition to terminate maintenance based on the argument that Julia engaged in a *de facto* marriage. The circuit court

agreed, finding that Julia engaged in a *de facto* husband and wife relationship with her former paramour and terminating her maintenance award. For the reasons below, we affirm.

¶ 3                                                    I. BACKGROUND

¶ 4        A supplemental judgment for dissolution of marriage entered in 2016 ordered Bruce to pay the sum of $1449.90 per month in maintenance to his ex-wife Julia until January 2031. The judgment also provided the "award of maintenance would, of course, terminate upon the occurrence of any event provided for in 750 ILCS 5/510(c)."

¶ 5        On December 22, 2017, Bruce filed a petition to terminate maintenance under the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/510(c) (West 2018)), alleging Julia's cohabitation with her paramour, Will Lukehart, on a continuing conjugal basis since July 1, 2016, warranted terminating her maintenance award. In January 2019, the circuit court heard arguments on the motion to terminate maintenance.

¶ 6        Bruce called Julia as an adverse witness during the hearing. Julia testified as follows. From July 2016, until December 15, 2017, Julia lived in a two-bedroom, two-bathroom condominium on Golfview Court in Erie, Illinois. The landlord of her Golfview condo threatened to raise her rent if she did not buy the property. Title defects prevented Julia's purchase of the condo. She, instead, moved into a home on Albany Street in the same town. Will and Julia toured the home together before Julia made an offer to buy, although they drove to the home separately. The Albany Street home was a two-story, four-bedroom residence. She maintained this residence until she sold it in September 2018. According to Julia, a $500 sewer repair bill and an anticipated bill to have the exterior of the home repainted, not the end of the relationship at issue, necessitated the sale. Julia then moved into a two-bedroom, two-bathroom rental home in Erie.

¶ 7        Julia began dating Will in September or October of 2015 and their relationship, including sporadic separations, continued until December 15, 2017. They broke up in August 2016, and this separation continued through September 2016. After a reconciliation, the couple again split-up in November 2016. Following another breakup, the couple resumed their relationship in March 2017. In May 2017, Julia broke off the relationship. The relationship resumed in the middle of August 2017. The periodic breakups were due to Will "cheating" on Julia. During their relationship, the two engaged in sexual intercourse and discussed marriage. Will proposed to Julia on November 11, 2017[1], giving Julia an engagement ring. Julia later claimed it was in December 2017 when Will proposed. She purchased Will a wedding band. The final breakup occurred on December 17, 2017. Julia returned the engagement ring to Will in January 2018.

¶ 8        Julia would stay all night at Will's house, also located in Erie, about once a month, while Will would stay at her home a "few times" per month. Julia did Will's laundry year-round; in return, Will mowed her yard. Will kept a motorcycle in Julia's garage and had a remote control for the garage door. Will also kept a gaming system, his grill, laundry, two of his firearms, uniforms for his job as a police officer, and received at least one piece of mail at her residence. Julia states she did not consent to the use of her address for Will's mail or guns. Will bought a cat for his daughters as a gift. Subsequently, the cat ended up living at Julia's and she now considers it hers. Julia claimed Will did not keep any personal items at her house aside from those mentioned above. Instead, he kept hygiene and other items in a backpack he brought back and forth. Sometimes the two would drive each other's vehicle, with Will parking his car in Julia's garage at times.

---

[1] The record shows that Julia claimed that Will proposed to her in 2018. However, after a clarification by her counsel and questioning by the court it subsequently became clear she meant to say 2017.

¶ 9        Will would stop by Julia's home for lunch frequently, even if just to visit. He also ate dinner at her home, and she would occasionally eat dinner at his home. They would both cook for each other and go grocery shopping together. The two paid for their own groceries. The couple dined out once a week, taking turns paying for the meals. Will frequently exercised parenting time with his daughters at Julia's home. His daughters spent the night there at times. Will's mother would also stay there when she visited, along with the children.

¶ 10       Julia could not recall the holidays she and Will spent together in 2015. In 2016, she remembered spending Easter, Thanksgiving, Christmas, and Christmas Eve together. For some of these holidays, the couple would stay all night at either Julia's or Will's family's home. Additionally, they vacationed with Julia's family at Wisconsin Dells. They stayed in a motel together and shared expenses. In 2017, the two spent some holidays together, visiting each other's family gatherings. Moreover, they took a trip to Galena, Illinois, staying in a hotel and splitting expenses.

¶ 11       Will never helped Julia with bills or vice versa. They never sent joint holiday greeting cards, and he never shoveled the snow at her home. Will did not contribute any money to the purchase of, or bills for, the Albany Street home. The couple did not have any financial accounts together. Julia knew her maintenance payments would terminate if she lived with Will.

¶ 12       Following Julia's testimony, Bruce called Will Lukehart to testify. Will qualified his testimony by stating that during the entirety of the relationship with Julia, he "was under the influence the whole two years so things are very, very foggy ***." He testified as follows. Will began dating Julia in the summer of 2015 with the relationship ending in early January 2018. The two had a sexual relationship during this period. The couple broke up in the fall of 2016 and again in the summer of 2017. Their last breakup occurred after Julia received Bruce's petition to

terminate maintenance. Julia was upset about the petition and tried to tell Will what to do and say regarding the petition. Will responded by saying he would answer any questions regarding the petition truthfully.

¶ 13        Once the couple reunited in August 2017, he stayed all night at Julia's "pretty much every night" until the relationship ended in January 2018. Will would leave his squad car at his house and then drive his personal vehicle to Julia's, sometimes parking in the garage. He would park his car in the garage at Julia's house because she did not want his vehicle seen in the driveway "all the time." He had a house key and garage door opener to the home on Albany Street. He had neither a house key nor a garage door opener for the Golfview condo. The couple would usually meet at Julia's home every day during lunch break and often ate dinner together. Will also kept toiletries, two firearms, and clothing at Julia's residence, as he did not always take things back and forth. He later said he would take toiletries and personal items back and forth in a backpack. Will stated that although he stayed at Julia's "a lot," he never felt like he was living there.

¶ 14        The couple first discussed marriage in 2016. They also discussed what their finances would look like if they were to marry, as Julia's maintenance would terminate. In the fall of 2017, Will and Julia went shopping for wedding rings. Will proposed in December 2017. After Will proposed, Julia purchased the Albany Street home. Will looked at the property with Julia five to six times before she purchased it. Julia bought the home so that Will's daughters would have bedrooms to stay in. While he did not contribute any money to the initial purchase of the home, he planned to do so in the future. Will paid for the service that moved Julia's belongings into the Albany Street home.

¶ 15        Will would occasionally shower at Julia's house, and the two would shop for groceries together. They would pay for their own groceries. Julia would generally cook their meals; they

would dine out about once a week with Will paying for the dining. His daughters spent the night at Julia's home a few times; the cat he had bought for his daughters as a gift lived there. Will would occasionally perform household chores at Julia's home, whatever needed cleaning he cleaned.

¶ 16 The two spent major holidays together starting in 2016, attending each other's family gatherings and holiday celebrations. They spent a night at his parent's home. The two purchased gifts for each other. Julia bought Will a watch and a guitar, while he had purchased her a television.

¶ 17 Julia injured herself while moving into the Albany Street home in December 2017. Will stayed with her at the home after the injury. He felt they were still together at this time and as far as he could remember, Julia was still wearing the engagement ring. They spent Christmas Eve with Julia's family that year. She returned the ring to him in early January 2018. Julia's friends and family brought Will his personal items after the "final breakup." The items included Will's clothing, along with a television and toys his daughters kept at Julia's home.

¶ 18 Next, Tom Madigan testified. Madigan is a licensed private investigator. Bruce hired Madigan to surveil Julia and Will. He observed Will leaving Julia's house in the morning, sometimes backing his car out of Julia's garage, going to his home to retrieve his squad car before going to work. Madigan also noticed that on days when trash was collected, trash cans would be outside of Julia's home, while no trash cans would be at the curb of Will's home. During investigations of the trash placed outside of Julia's home, Madigan found empty chewing tobacco containers, contact lens solution, and a piece of Will's mail with Julia's address on it. This was of note because Julia did not wear contacts or chew tobacco. Madigan observed Will's motorcycle parked inside of Julia's garage. He also photographed the couple during a trip to an Iowa state park to meet Will's mother for a picnic. Will's daughters were also on the trip. Madigan finally noted

that he saw Will take Julia's Cadillac and go to what he believed to be the babysitter for Will's daughters, pick them up, and then return to the Golfview residence.

¶ 19 Nicole Lukehart also testified. Nicole is Will's ex-wife and lived only a few houses away from Julia's Golfview residence. Although she was not keeping count, Nicole observed Will's vehicle parked at Julia's residence in the morning and evening hours on multiple occasions. She also observed Will exercising his parenting time at Julia's residence. She confronted Will about exercising his overnights with the children at Julia's. She demanded he conform to their parenting plan, which required Will to exercise overnights at his residence. According to Nicole, in spite of her insistence, Will continued to exercise overnight parenting time at Julia's.

¶ 20 Brian Hawk testified. Hawk was a patrol officer for the Erie Police Department. Will was his supervisor. Hawk's shifts at the department mostly ran from 3 a.m. to 3 p.m. Although he was not keeping count, he frequently observed Will's vehicle parked outside of Julia's home in the fall of 2017. If he needed to contact Will and could not reach him via phone during this time period, he would go to Julia's home to find Will. Hawk recounted to the court one incident in particular when he delivered a DUI packet to Will at Julia's home one evening. Will answered the door in his boxer shorts.

¶ 21 Bruce testified during his case-in-chief. Bruce relocated from Erie to Moline, Illinois, after his divorce from Julia but still visits Erie every week to 10 days to see family members. During his visits, he saw Will's vehicle in Julia's driveway as early as 7:30 a.m. and as late as 9 to 10 a.m. He also observed Will's vehicle at Julia's in the evenings. Additionally, Bruce observed Julia and Will together at a music festival in the Quad Cities. These circumstances prompted Bruce to hire Madigan to surveil the couple.

¶ 22 Julia called her friend Veronica Saad to the stand. Saad testified that Julia would come to her house daily when her swimming pool was in use. According to Saad, she and Julia are like sisters. Saad and Julia would eat dinner together and engage in social activities. She was aware that Julia was dating Will, but he was only at her house on one occasion and only participated in group activities at Julia's home sporadically. Saad helped Julia move into the Albany Street home and never saw any of Will's clothes in Julia's closet. Once Julia and Will broke up, Saad's husband and Julia's dad took Will's personal items from Julia's home and returned them to Will. Will returned his key to the Albany Street home to Saad.

¶ 23 Two of Julia's family members testified: Neil Earl, Julia's father, and Gina McCormick, Julia's sister. Earl testified that Will did not participate in the purchase of the Albany Street home. He could not recall whether Will attended family holidays but remembered him being present during the 2016 family trip to Wisconsin Dells. McCormick frequently visited Julia during the relationship with Will. During this time, McCormick would look through Julia's closet and did not notice any of Will's clothing. She recalled Will being present at some of the family holiday gatherings. Will and Julia stayed the night at her home in one instance. She also recalled that some of Will's property was returned to his ex-wife Nicole's home after the breakup.

¶ 24 The circuit court took the matter under advisement, thereafter, issuing a written opinion and order. The court, after considering the totality of the circumstances and weighing the credibility of each witness, found Will and Julia were involved in a *de facto* husband and wife relationship. The court acknowledged the parties had broken up at times but found that over the approximately 2½-year period, the couple spent the majority of that time in a relationship. While the court noted that some of the circumstances which led to the finding of the *de facto* marriage occurred early in the relationship, they "finally reached the tipping point in favor of such a finding

with the parties' actions beginning in August, 2017." The court ordered Julia's maintenance award to terminate as of August 2017.

¶ 25    This appeal followed.

¶ 26                                    II. ANALYSIS

¶ 27    Julia argues the circuit court's overall finding that she and Will cohabitated on a resident, continuing conjugal basis resulting in a *de facto* marriage as opposed to an intimate or dating relationship is unsupported by the manifest weight of the evidence. She goes to lengths in her brief to point out inconsistencies in testimony and highlights facts that she proposes militate a finding that the couple did not intend "to live life as partners[.]" Bruce responds by claiming he met his burden of showing Julia engaged in a *de facto* marriage. Bruce avers that Julia's "real complaint" on appeal is that the circuit court did not place more weight on her "self-serving testimony."

¶ 28    Illinois law provides "the obligation to pay future maintenance is terminated *** if the party receiving maintenance cohabits with another person on a resident, continuing conjugal basis." 750 ILCS 5/510(c) (West 2018). The burden of establishing the cohabitation is on the party seeking termination of the maintenance obligation. *In re Marriage of Walther*, 2018 IL App (3d) 170289, ¶ 25. To satisfy their burden, the party seeking termination "must make a substantial showing that the former spouse is involved in a *de facto* husband and wife relationship with a third party." *In re Marriage of Thornton*, 373 Ill. App. 3d 200, 208 (2007).

¶ 29    "To determine if such a relationship exists, courts have examined the following factors: (1) the length of the relationship; (2) the amount of time the couple spends together; (3) the nature of activities engaged in; (4) the interrelation of their personal affairs; (5) whether they vacation together; and (6) whether they spend holidays together." *Snow v. Snow*, 322 Ill. App. 3d 953, 956 (2001) (citing *In re the Marriage of Herrin*, 262 Ill. App. 3d 573 (1994)). This is a nonexhaustive

list of factors a court should consider with the ultimate decision being based on the totality of the circumstances. *Herrin*, 262 Ill. App. 3d at 577.

¶ 30    We give great deference to the lower court's factual findings as it stands in the best position to weigh the credibility of all witnesses. *Id.* Each termination case is *sui generis*, "just as no two relationships are alike, no two cases are alike." *In re Marriage of Miller*, 2015 IL App (2d) 140530, ¶ 40. A reviewing court will not reverse the lower court's finding of a *de facto* marriage unless that finding is contrary to the manifest weight of the evidence. *In re Marriage of Sunday*, 354 Ill. App. 3d 184, 189 (2004). A court's finding is contrary to the manifest weight of the evidence when an opposite conclusion is clearly evident or the court's decision is unreasonable, arbitrary, or not based on the evidence. *Walther*, 2018 IL App (3d) 170289, ¶ 26.

¶ 31    Having reviewed the record, we cannot say the circuit court's judgment is against the manifest weight of the evidence. We first consider the length of Julia and Will's relationship. Julia requests we find that the length of the relationship was only four months and that amount of time is insufficient to consider the habitation continual. However, "[w]hether a relationship is continuous cannot be measured in terms of time alone." *In re Marriage of Roofe*, 122 Ill. App. 3d 56, 58 (1984). Julia and Will's relationship spanned over a period of approximately two years, albeit intermittent. Overall, their relationship included "approximately 27 months of on and off dating" culminating in an engagement. They were engaged for at least a month, possibly two, given the dates provided. This factor supports the circuit court's determination.

¶ 32    Next, we consider the amount of time the couple spent together in light of the record. The evidence supports the conclusion that Will abandoned his residence and was living at Julia's. Will testified that after the two reconciled in August 2017, he stayed nearly every night at Julia's until January 2018. Will and Julia would meet frequently for lunch and dinner during this period.

- 10 -

Corroborating these assertions is the testimony of Madigan, Hawk, and Nicole Lukehart: that Will and his vehicle were frequently seen in the morning, evening, and lunch hours of the day on multiple occasions. The couple took numerous trips together and Will exercised parenting time at Julia's home to the extent that the girls had toys there and the pet cat lived there. The amount of time Julia and Will spent together supports the circuit court's judgment.

¶ 33 Third, we examine the nature of activities Will and Julia engaged in. Both Will and Julia testified that their relationship was sexual in nature. The two took overnight trips together, sometimes with Will's daughters. As discussed above, Will spent practically every night at Julia's house after the couple reunited in August 2017. They also frequently ate lunch and dinner with one another. Julia laundered Will's clothing, while Will mowed Julia's grass and did some household chores at her home. Will exercised his parenting time with his daughters at Julia's home, sometimes overnight. Will's mother, on at least one occasion, also stayed the night at Julia's. The couple went grocery shopping together and cooked each other meals. The testimony is conflicting whether Will had a garage door opener to the Golfview residence, but he did have a key and garage door opener to the Albany Street residence giving him unfettered access to the home. Will kept his motorcycle at Julia's home along with other personal items. The two went shopping for an engagement ring for Julia and a wedding band for Will. The couple also discussed marriage. Will proposed to Julia and the two were engaged for at least four months. Julia wore her engagement ring and bought a wedding band for Will. Will accompanied Julia when she was looking at the home on Albany Street. Will and Julia would go out to eat once a week. The couple would drive each other's vehicles. The nature of activities engaged in supports the finding of the circuit court.

¶ 34 Fourth, we assess the evidence of interrelation of the parties' personal affairs. As laid out above, the couple intermingled many aspects of their lives. The two were engaged and Will often

exercised parenting time with his daughters at Julia's residence, sometimes having them spend the night there. Will's daughters had toys and a pet at Julia's home. Will's coworker brought work-related items to him at Julia's home. Will received at least one piece of mail at Julia's home. He paid for the moving company that transferred Julia's belonging to the Albany Street home. Julia and Will did not commingle finances. However, they did discuss what their finances would look like once they were married. The evidence supports the finding that Julia bought the Albany Street home with four bedrooms to accommodate Will and his daughters. This is supported by the fact that after the "final breakup," Julia sold the Albany Street home and returned to a two-bedroom rental. The interrelation of personal affairs supports the circuit court's finding.

¶ 35    The final two factors require that we examine whether the two vacationed together and whether they spent holidays together. The testimony of multiple witnesses establish that Will and Julia took numerous trips together. The pair stayed overnight in lodging accommodations and at family member's homes. The two took a trip to the Wisconsin Dells together and stayed overnight. The two also took a trip to Galena together and stayed overnight. Bruce testified he saw the couple at a music festival in the Quad Cities. Madigan testified that the two took a trip to Iowa with Will's daughters to see Will's mother. Julia testified that she and Will began spending holidays together in 2016. That year they spent Easter and Thanksgiving with Julia's family and traveled to Will's mother's house to exchange Christmas presents prior to Christmas, as Will's family celebrated holidays prior to their calendar date. The couple also attended Julia's family Christmas Eve gathering that year. Will testified that they spent all the major holidays together in 2017. Julia's testimony conflicts with this assertion but she did admit to spending Christmas Eve that year with Will at her parents. These factors weigh in favor of the circuit court's finding.

¶ 36    After reviewing the suggested factors and the totality of the circumstances, we do not find an opposite conclusion is clearly evident or that the circuit court's decision is unreasonable, arbitrary, or not based on the evidence.

¶ 37    Julia states that *Miller* is analogous to the instant case and necessitates reversal of the circuit court. *Miller*, 2015 IL App (2d) 140530. The *Miller* court recognized that courts have considered the abovementioned nonexhaustive list of factors in determining whether a *de facto* marriage exists. *Id.* ¶ 40. The court then went on to caution that these factors "are not a checklist." *Id.* ¶ 46. Courts instead should distinguish between *de facto* marriages and intimate dating relationships by viewing the totality of the circumstances and by looking for signs of mutual commitment and permanence. *Id.* ¶ 50. The *Miller* court stated that the facts falling into each of the six categories "must achieve a gravitas akin to marital behavior." *Id.* ¶ 60.

¶ 38    *Miller* is factually distinguishable from this matter. Specifically, facts in this case not present in *Miller* include, an engagement complete with rings, unfettered access to the home, purchase of a home to blend families, use of each other's vehicle, undertaking of household chores, and the parties spending the night with each other on a frequent basis. See *id.* ¶¶ 62, 67, 69. Taking the holding from *Miller* that the facts that relate to each factor should demonstrate a gravitas akin to marital behavior, we believe the totality of the circumstances shows just that.

¶ 39    Accordingly, the manifest weight of the evidence supports the circuit court's judgment.

¶ 40                                III. CONCLUSION

¶ 41    For the foregoing reasons, we affirm the judgment of the circuit court of Whiteside County.

¶ 42    Affirmed.

¶ 43    JUSTICE McDADE, dissenting:

- 13 -

¶ 44         I dissent from the majority's decision that affirms the circuit court's decision to terminate maintenance. As the majority notes, section 510(c) permits the termination of a maintenance obligation when the recipient of maintenance "cohabits with another person on a *resident, continuing* conjugal basis." (Emphasis added.) 750 ILCS 5/510(c) (West 2018). I disagree with the majority's characterization of Will's living situation between August 2017 and January 2018 as an abandonment of his own residence. *Supra* ¶ 32. Moreover, even if Will stayed over at Julia's residence nearly every night during that time, merely staying over at a significant other's residence, by itself, does not constitute cohabitating with that person on a resident, continuing basis. See *Thornton*, 373 Ill. App. 3d at 208 (holding that "something more than merely living under the same roof with a person of the opposite sex is required"). In fact, the evidence showed that Will still maintained his residence and did not contribute financially to Julia's residence or her day-to-day financial responsibilities.

¶ 45         I also find several other facts to be significant. First, Julia had broken off the relationship several times due to Will's infidelity. These break-up periods lasted for a significant number of months during the two-plus years during which they dated. Second, there was no commingling of finances during the relationship. In fact, it appears that to the extent they traded off paying for meals, this was no different than any typical intimate dating relationship. Third, it is not uncommon for people to discuss some future plans with their significant other, and the extent to which Julia and Will did so here was not atypical. When viewed in conjunction with the rest of the evidence presented in the circuit court, these facts indicate that Julia and Will had a typical intimate dating relationship, not a *de facto* marriage. I am further concerned that if courts are going to find this type of relationship to constitute a *de facto* marriage, many maintenance obligations will be terminated in situations in which the legislature intended them to continue.