2020 IL App (2d) 200289-U
No. 2-20-0289
Order filed September 24, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF, | ) | Appeal from the Circuit Court |
| STACY GOODMAN, | ) | of Lake County. |
| Petitioner-Appellee, | ) | |
| | ) | Nos.  13-D-2139 |
| and | ) | 17-OP-486 |
| | ) | |
| DRU GOODMAN, | ) | Honorable |
| | ) | Janelle K. Christensen, |
| Respondent-Appellant. | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Justices Zenoff and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Petitioner failed to establish "good cause" for the extension of a plenary order of protection which prohibited respondent, either personally or through his agents, assigns, or any other person or company on his behalf, from engaging in surveillance of petitioner because surveillance, in and of itself, is not prohibited and the only new evidence petitioner elicited at the hearing on her motion to extend the order of protection was respondent's testimony that he would surveil petitioner again to investigate cohabitation based on the advice of legal counsel and petitioner's testimony that she was fearful of the resumption of surveillance.

¶ 2    On September 6, 2017, the circuit court of Lake County entered a plenary order of protection in favor of petitioner, Stacy Goodman, and against respondent, Dru Goodman. The plenary order of protection enjoined respondent from "engaging in surveillance of the Petitioner,

either personally or through his agents, assigns, or any other person or company on his behalf." Prior to the expiration of the order of protection, petitioner filed a motion to extend it. On March 5, 2020, following a hearing, the trial court granted petitioner's motion and entered an order extending the plenary order of protection until March 5, 2022. On April 29, 2020, respondent filed a notice of interlocutory appeal from the March 5, 2020, order pursuant to Illinois Supreme Court Rule 307(a)(1) (eff. Nov. 1, 2017).[1] On appeal, respondent argues that, for various reasons, the trial court's decision to extend the order of protection for an additional two years "was contrary to the manifest weight of the evidence and an abuse of discretion." We conclude that the trial court's decision was against the manifest weight of the evidence because surveillance, in and of itself, if properly conducted, is not prohibited and the only new evidence that petitioner elicited at the hearing on her motion to extend was respondent's testimony that he would surveil petitioner again to investigate cohabitation based on the advice of legal counsel and petitioner's testimony that she was fearful of the resumption of surveillance. Accordingly, we reverse the judgment of the trial court and vacate the order granting the extension of the order of protection.

¶ 3                                     I. BACKGROUND

¶ 4      The following facts are taken from the supporting record filed in this appeal as well as the Rule 23 order disposing of the parties' prior consolidated appeals (*In re Marriage of Goodman*,

---

[1] Normally, a notice of interlocutory appeal must be filed within 30 days after the entry of the interlocutory order being appealed from. Ill. S. Ct. R. 307(a) (eff. Nov. 1, 2017). However, in response to the Covid-19 pandemic, the Illinois Supreme Court entered M.R. 30370, which extended the deadline to file a notice of appeal due on or after March 24, 2020, to 60 days from the date of the circuit court judgment.

2019 IL App (2d) 170621-U (modified upon denial of rehearing, March 18, 2020)). Petitioner and respondent were married on October 19, 1996. Three children were born of the marriage. Late in 2013, each party filed a petition for dissolution of marriage. On July 26, 2017, following a multi-day trial, the court entered a judgment of dissolution of marriage. Among other things, the judgment required respondent to pay petitioner maintenance in the amount of $65,000 per month.

¶ 5　　　During the pendency of the dissolution proceedings, the parties engaged in extensive motion practice on a range of matters. For instance, on December 4, 2013, petitioner presented an emergency motion to compel respondent to fund the purchase of a residence for her, the cost of which exceeded $1 million. The trial court denied the emergency motion. On December 11, 2013, petitioner filed an emergency petition for an order of protection. On December 20, 2013, the trial court entered an agreed order which required respondent to cooperate and transfer funds for petitioner's purchase of a new residence. The December 20, 2013, order also provided that petitioner's emergency petition for an order of protection had been withdrawn and "shall be purged from the court file." A separate order entered on December 20, 2013, restrained each party from harassing, intimidating, or interfering with the other's liberty.

¶ 6　　　On March 22, 2017, petitioner filed a verified petition for an order of protection against respondent pursuant to the Illinois Domestic Violence Act of 1986 (Domestic Violence Act) (750 ILCS 60/1 *et seq.* (West 2016)). That petition was docketed in the trial court as case No. 17 OP 486 and consolidated with the dissolution action. In an affidavit attached to the petition, petitioner asserted that when she resided in the marital home, "[respondent] maintained constant, 24-hour surveillance of [her]" using cameras placed throughout the interior and exterior of the residence. Petitioner further stated that she suspected that respondent had hired a private investigator to follow her soon after she filed for divorce. Petitioner stated that her suspicion was confirmed on

December 31, 2015, when her boyfriend, Matthew Kornick, looked out the window of petitioner's home and observed a camera flash come from a car parked nearby. At that time, petitioner exited her residence to obtain the car's license-plate number, but the vehicle began to drive away. Petitioner entered the street to stop the driver. The driver turned on his high beams and drove towards petitioner. Petitioner quickly moved away from the car to avoid being run over. Petitioner obtained the license-plate number and filed a police report. She later learned that the owner of the car was Bing R. Apitz, a private investigator. After the incident with Apitz, petitioner's attorneys issued a discovery request to respondent. In response, petitioner learned that between September 2013 and April 2016, respondent had someone follow, videotape, and photograph her for approximately 12 hours per day at her home, on vacation, and in public places. Petitioner also discovered that respondent had spent more than $1.295 million to surveil her. Petitioner stated that respondent's constant surveillance had caused her emotional distress and anxiety. Petitioner stated that she continued to fear that someone was following and recording her because, on February 27, 2017, respondent disclosed that another private investigator, Robert Scigalski, had provided services to him.

¶ 7    In his response to the petition, respondent alleged that petitioner's claim of distress was pretextual because she withdrew the December 2013 emergency petition for an order of protection in exchange for "a financial payoff" in which respondent agreed to advance her money to purchase a home. Respondent further explained that petitioner was seeking maintenance, but he believed that petitioner and Kornick were cohabiting. Thus, respondent asserted, the surveillance was "in pursuit of relevant information or information that may lead to relevant information" regarding cohabitation and that the discovery methods employed "do not fall within the definition of 'harassment' as defined by the [Domestic Violence Act]."

¶ 8    On April 12, 2017, the trial court entered an agreed interim order of protection that, among other things, prohibited respondent or an investigator or agent on his behalf from harassing or stalking Stacy. Following entry of the interim order of protection, the Illinois Department of State Police (Department) revoked respondent's firearm owner's identification (FOID) card pursuant to section 8.2 of the FOID Card Act (430 ILCS 65/8.2 (West 2016)). The agreed interim order, which was set to expire in May 2017, was extended multiple times. Ultimately, a hearing on petitioner's verified petition for an order of protection was held over three dates in August and September 2017 before the Honorable Joseph Salvi. Five witnesses testified at the hearing: Scigalski, Grady Vogt, respondent, John Purdy, Jr., and petitioner.

¶ 9    Scigalski testified that he is a retired Federal Bureau of Investigation (FBI) agent who works as a private investigator. Scigalski was hired by respondent's attorney to investigate whether petitioner and Kornick were cohabiting. Scigalski's investigation lasted from February 15, 2017, through March 25, 2017. Surveillance would often start at petitioner's home, and the agents would follow her and the children to see if Kornick was there. All surveillance was within the law after advising the local police. Scigalski described how the surveillance revealed individuals associated with Kornick, petitioner shopping and eating at restaurants with the children and Kornick, and petitioner and Kornick together at a school event for the parties' son. At times, the surveillance was for 18 hours a day. Scigalski also testified as to his understanding of "cohabitation." Scigalski defined the term as "when two people live together and conduct their life together *** [a]s if they were married." Scigalski acknowledged that petitioner and Kornick do not live together and reside in separate abodes. Scigalski charged over $100,000 for his work.

¶ 10    Vogt testified that he is employed by DDG, Inc., the corporation of which respondent is president. In 2013, respondent confided that he was having family problems, was receiving

threatening phone calls, and expressed concern for the well-being of his children. In August 2013, Vogt hired private investigator Bob Arden without respondent's knowledge and instructed Arden to investigate petitioner's whereabouts and what she was doing and to look out for respondent's safety and the safety of the parties' children. When Arden discovered petitioner was consistently with another man, the directive changed to investigating possible cohabitation. Vogt engaged Purdy to oversee Arden. Respondent knew about the investigator two or three months after Vogt hired him. According to Vogt, surveillance ceased "[b]efore the trial."

¶ 11    Respondent testified that he did not learn that Vogt hired an investigator until December 2013 or January 2014. He understood Vogt did so initially for the safety of respondent and his children because petitioner was bringing the children around Kornick. The investigation continued so as "to prove adultery" and subsequently conjugal cohabitation. Respondent testified that the investigation lasted until August 2016, but his divorce counsel hired another investigator and that investigation lasted until around March 2017. Respondent also testified regarding the cameras and other surveillance equipment installed at the former marital residence.

¶ 12    Purdy testified that he has been a licensed attorney since 1966. Vogt engaged him on behalf of Vogt's employer to review investigator Arden's reports "to make sure that there were no problems for [DDG] and its officers." Once Purdy reviewed the reports, he would send them to Vogt. Purdy charged $375 per hour for his services. Purdy did not find anything improper about the way the reports were prepared.

¶ 13    Petitioner initially testified regarding the surveillance system in the former marital home. Petitioner then testified that she first believed she was under surveillance following the filing of her petition for dissolution of marriage late in 2013, when she was visiting Kornick at a friend's house in Wheeling. At that time, her friend's neighbor saw someone take pictures and look into

the windows of petitioner's car. Petitioner testified that when she learned that someone was taking photographs of her car, it made her feel "[a]ngry, anxious, violated." Petitioner addressed her feelings with a therapist. Petitioner further testified that she "periodically would see people" and was suspicious of being watched but became certain on December 31, 2015, when, from the window of her home, Kornick saw flashes from someone taking pictures of her and Kornick's cars in her driveway. Petitioner ran outside to get the license plate number of the vehicle. As the car approached petitioner, she placed her hands up to stop the vehicle. However, the driver kept going so petitioner jumped out of the way. Petitioner later contacted the police. Petitioner testified that once she was able to confirm that she was being followed she felt "worse" because she wondered who was watching her. Petitioner explained that she has become paranoid and that she cannot sleep sometimes at night.

¶ 14    Petitioner acknowledged on cross-examination that she began seeing a therapist long before the divorce proceedings commenced. With respect to the incident on December 31, 2015, she also acknowledged that the private investigator did not come onto her property.

¶ 15    At the conclusion of the evidence on September 6, 2017, the trial court entered a two-year plenary order of protection against respondent. The court made the following remarks in support of its ruling:

> "Counsel, the forthcoming [*sic*] about her relationship with Matt Kornick, what business is it of any of ours other than as it relates to the issue of cohabitation? We are not the moral police. We are not the judgment police. We are—the only—I had already ruled on the issue of cohabitation. That wasn't even close.
>
> And what I have here is I have an obsessive pattern of surveillance of his wife that was precipitated, not by the trying [*sic*] to draw a legal conclusion as to whether she was

cohabitating, but initially to show that she was having an affair, which is not something *** of concern to me certainly now. And that was his—and I get it, but that was his personal concern.

If he were the one surveilling, if he were the one outside the house, if he were the one following her to her boyfriend's apartment, if he were the one taking 2,000 pictures, this wouldn't even be a question. But because he has the means, the means to hire a high-end private investigator, all of a sudden it is, oh, it is okay. He has the ability to—in which actually makes it worse because she knows he has the ability. She knows that he is a guy who puts cameras in his house and moves them around during the midday to watch what is going on. He—I mean, this is a—this became obsessive.

Anybody who would spend $1.5 million over a period of little over three years in private investigators is somebody with too much money and who is obsessed. And that in and of itself causes—would cause any reasonable person anxiousness, all the terms she used, to be afraid, angry, upset. I would be—any of us would be furious if somebody surveilled us like that. We would all feel violated, that's the perfect word, violated. This is beyond any means, and I will take it beyond necessary to accomplish a purpose.

This is—this is—you know, you did great research on your cases. But I don't know what those other—the rules of the definitions given by the statute in those other states. But for me to just like totally disregard what the definition of harassment is as defined by the statute, harassment means knowing conduct which is not necessary to accomplish a purpose. This was not necessary to accomplish a purpose. This was not necessary to accomplish any purpose. The initial purpose was to find out if she was having an affair. It ultimately transformed into whether or not she is cohabitating. But

that would mean that only people of means of Dru Goodman could prove cohabitation, which is not the case.

Would cause a reasonable person emotional distress and does not cause—and does cause. Unless the presumption is rebutted, this hits two things, repeatedly follow Petitioner about in a public place or places. Now, trust me, when they wrote this, they had no idea that somebody would be surveilled like she was surveilled. I mean, some of these time sheets that I saw that are in evidence are 18 hours a day. She is sleeping, and they are outside her house.

How would you like a van outside your home with your children surveilling you? How would you like it? We would feel violated.

The other thing is repeatedly keeping Petitioner under surveillance by remaining present outside his or her home or in other places. I mean, this fits it perfectly. And I could go like this and say, oh, it is some wealthy guy who has the means to hire a fancy former FBI agent, and he won't violate the law because he knows what the law is or he is clever enough to not be seen all the time. But this is it. We would all be violated. This is a perfect—this is—this I don't care what the Appellate Court does with this if you appeal because I am following the law. How they manipulate it, I don't care because this is—these facts fit the statute perfectly.

I am going to enter the order. It is going to be a two-year order. The order is just going to prevent him or agents of him from surveilling her outside her home. She is not working, right? So her home, her social, like a health club or whatever known social locations we can name within the petition for two years.

I think from the way I am expressing myself, I think I am making my point that

this was completely and utterly inappropriate and warrants a plenary order of protection." In the written order of protection, the trial court did not check any of the boxes with respect to caution indicators, firearms, or police enforced remedies, but specifically enjoined respondent "from engaging in surveillance of the petitioner, either personally or through his agents, assigns, or any other person or company on his behalf." In conjunction with the plenary order of protection, the trial court, at respondent's request, entered an order providing that "[Respondent's] FOID card shall be reinstated and returned to [respondent] with no restrictions."

¶ 16    On January 12, 2018, the Department filed in the trial court a "Non-Party *** Petition to Intervene as a Matter of Right." The Department sought leave to intervene pursuant to section 2-408(a)(2) of the Code of Civil Procedure (Code) (735 ILCS 5/2-1408(a)(2) (West 2016)) to file a motion to vacate that part of the trial court's September 6, 2017, order requiring the reinstatement of respondent's FOID card. Respondent moved to dismiss the Department's petition, arguing, among other things, that the request was untimely, having been filed more than 30 days after the disposition of the last pending postjudgment motion. The trial court granted respondent's motion to dismiss, ruling that it lacked jurisdiction to grant the Department's petition to intervene.

¶ 17    In the direct appeal from the dissolution proceeding, respondent argued, *inter alia*, that the plenary order of protection entered by the trial court was against the manifest weight of the evidence and should be reversed because it was necessary to accomplish a purpose which is reasonable under the circumstances, *i.e.*, gathering evidence of cohabitation in a divorce case. *Goodman*, 2019 IL App (2d) 170621-U, ¶ 146. Following oral argument, this court, in an order entered on July 31, 2019, concluded that while a party to a divorce action is not prohibited from engaging a private investigator to gather relevant evidence, the duration and scope of the surveillance at issue exceeded what was reasonably necessary to gather evidence of cohabitation.

*Goodman*, 2019 IL App (2d) 170621-U, ¶¶ 167, 169. We also determined that the trial court's finding that the conduct at issue caused petitioner emotional distress was not against the manifest weight of the evidence. *Goodman*, 2019 IL App (2d) 170621-U, ¶ 171. Thus, we affirmed the trial court's decision to enter the plenary order of protection against respondent. *Goodman*, 2019 IL App (2d) 170621-U, ¶ 171. In addition, we granted the Department's petition to intervene as an appellant in the direct appeal and held that the trial court erred in dismissing the Department's petition to intervene in the trial court. *Goodman*, 2019 IL App (2d) 170261-U, ¶¶ 208-212. Pursuant to our authority under Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994), we granted the Department's request to intervene in the trial court and remanded the matter to allow the Department to file its motion to vacate that part of the September 6, 2017, order requiring the reinstatement of respondent's FOID card and to hold further proceedings thereon. *Goodman*, 2019 IL App (2d) 170261-U, ¶ 212.

¶ 18    The plenary order of protection was set to expire on September 6, 2019. However, it was continued for six months after petitioner filed, on August 29, 2019, a motion to extend the plenary order of protection pursuant to section 220(e) of the Domestic Violence Act (750 ILCS 60/220(e) (West 2018)). In the motion to extend, petitioner reiterated the allegations set forth in her verified petition for plenary order of protection and the affidavit attached thereto, set forth the circumstances surrounding the trial court's entry of the plenary order of protection, detailed this court's affirmance of the order of protection, and reviewed various provisions of the Domestic Violence Act. Petitioner then argued that an extension of the plenary order of protection was warranted "[b]ased upon [respondent's] continuing hostility and belligerence towards [her], as well as his unabated 'obsession' with her." Petitioner further contended that based upon statements made by respondent's attorney during oral argument before this court in the underlying appeal, "it

2020 IL App (2d) 200289-U

is clear that [respondent] will resume his around-the-clock surveillance of her once the Plenary Order of Protection expires." Petitioner asserted that "[t]he thought of once again having [respondent's] full-time investigators stalk her every waking moment, both at home and in public places, as previously occurred prior to the entry of the Plenary Order of Protection, has caused [her] tremendous anxiety and emotional distress." Petitioner attached an affidavit in support of her motion.

¶ 19    In his response to the motion to extend, respondent asserted that during the entire term of the plenary order of protection, he had been fully compliant and did not engage in any activity to surveil petitioner. He also asserted that section 220(e) of the Domestic Violence Act (750 ILCS 60/220(e) (West 2018)) permits the extension of a plenary order of protection only for "good cause shown" and, pursuant to "applicable case law, a showing of 'good cause' under the [Domestic Violence Act] requires a showing of some continued misconduct or violation of the original order before an extension is granted." Respondent argued that petitioner had failed to allege any misconduct by him subsequent to the entry of the April 2017 interim order of protection and that petitioner's motion is "based almost exclusively upon the original facts of this case, without any 'good cause shown' as to why [the] Court should extend said Order." Instead, petitioner blamed her continuing anxiety solely on appellate counsel's comments during oral argument. With respect to the surveillance itself, respondent answered that this court only took issue with the scope and duration of the surveillance, not the fact that surveillance had been conducted. Respondent pointed out that petitioner's own appellate counsel admitted during oral argument that a payor spouse is "allowed to surveil" for an intended purpose such as to prove cohabitation. Further, respondent set forth that section 214 of the Domestic Violence Act (750 ILCS 60/214 (West 2018)) directs the circuit court to balance the hardships to the parties. Given that he was paying petitioner $65,000

per month in maintenance, respondent contended that the court should at least allow lawful discovery if there was a potential to uncover statutory cohabitation with Kornick. According to respondent, petitioner "is effectively requesting permanent insulation from discovery regarding the issue of cohabitation."

¶ 20    In her reply to respondent's response, petitioner asserted that there is scant case law describing "good cause shown" under section 220(e) of the Domestic Violence Act (750 ILCS 60/220(e) (West 2018)) and that respondent's argument is based on a "false premise that in order to show good cause for an extension of an order of protection *** the petitioner must show that the respondent violated the terms of that order." Petitioner asserted that the rules of statutory construction do not support such an interpretation. Petitioner reiterated her reliance on the statement of respondent's counsel during oral argument in the underlying appeal before this court, pronouncing the statement a "judicial admission." Petitioner also contended that she had good cause for the extension based on facts and circumstances that had arisen since she filed her motion to extend on August 29, 2019. Specifically, petitioner quoted from a report by a post-judgment custody evaluator, Dr. Louis Kraus, to the effect that respondent felt that it was his right to hire a private investigator to assess petitioner, but petitioner thought it was an intrusion on her privacy, an issue Kraus said would have to be decided by the court.

¶ 21    Respondent filed two motions *in limine* with respect to petitioner's purported good cause evidence. The first motion sought to exclude Dr. Kraus as a witness. The second motion *in limine* sought to bar petitioner from recycling evidence from the hearing on the plenary order of protection to establish good cause for an extension. A hearing on respondent's motions *in limine* was held on February 18, 2020, before the Honorable Janelle Christensen. Regarding the first motion *in limine*, the court did not foreclose petitioner from calling Dr. Kraus, but petitioner never called him at the

hearing on the motion to extend. With respect to the second motion *in limine*, the court stated its belief that, under the Domestic Violence Act, abuse leading to the entry of an order of protection could be so "egregious" that a violation of the order would be unnecessary to extend it beyond the initial term. The court decided that, since it had the transcripts of the prior order of protection hearing, it did not need to rehear the evidence but that it is "allowed to consider it." The court therefore denied the second motion *in limine* in part and granted it in part, directing the parties to submit the transcripts and exhibits from the plenary order of protection hearing in 2017 for the court to review.

¶ 22    The hearing on the motion to extend commenced on March 4, 2020, before Judge Christensen. As a preliminary matter, the court heard petitioner's counsel on the statements made by respondent's attorney at the oral argument in the underlying appeal concerning the right to conduct surveillance in Illinois. The court found that the statements constituted legal argument and would not be considered. The court then noted that it was in possession of the underlying record, which it would incorporate into the proceeding.

¶ 23    Petitioner called respondent as her first witness. Initially, respondent confirmed that his income has not changed since the entry of the 2017 plenary order of protection and that he has not surveilled or had anybody surveil petitioner since the entry of the 2017 plenary order of protection. Respondent denied that the main reason he was objecting to the extension of the order of protection was to have his FOID card returned. However, he admitted that when asked at his deposition why he was objecting to the extension, he responded, "I would like to get my FOID license back." Respondent clarified that while the return of his FOID card is one of the reasons he is objecting to the extension of the order of protection, it is not the "pressing reason."

¶ 24    Respondent further testified that on April 22, 2019, he told Dr. Sol Rappaport (a mental

health professional appointed by the court to conduct an evaluation related to parenting issues) that he suspected that petitioner and Kornick were living together. The basis for respondent's suspicion was that the parties' children told him that they were annoyed that Kornick was around petitioner's house often. Respondent testified that he had "no idea" if petitioner and Kornick are cohabitating now because the children said Kornick was around less frequently after Kornick was caught sending the youngest child "vile" and "perverse" text messages. At the time he suspected petitioner and Kornick were living together, respondent did not know if Kornick had his own apartment.

¶ 25    Respondent testified that he told Dr. Kraus that he was not allowed to hire a private investigator, but it was possible that a court could lift that restriction. The following exchange then occurred between petitioner's attorney and respondent:

"Q. So I take that to mean, and I may be wrong, that if the judge lifts the Order of Protection, that means that it is no longer in effect, you will then hire private detectives to follow [petitioner] for reasons that she is cohabiting; correct?

A. You may be wrong, that's correct.

Q. You may be wrong?

A. Yeah, you said you may be wrong and you may be wrong.

Q. Am I wrong?

A. I don't know yet.

Q. What do you mean you don't know?

A. I don't know.

Q. You don't know if you're going to follow her or not?

A. I don't know if—I want to reserve my right to hire a private investigator if the order is off, but I don't know if I'm going to hire it [*sic*]. We are going to have to base that

on suspected cohabitation."

Respondent clarified that he may or may not resume surveillance of petitioner if the court permits it. He would surveil petitioner again to investigate cohabitation based on the advice of legal counsel. Respondent suspects "a little bit" that petitioner and Kornick are living together. Respondent disagreed that it was "logical" that he would reinstitute surveillance since he suspects cohabitation, explaining that he does not know what he would do in the future. Respondent also denied being "obsessed" with petitioner. Respondent did not believe petitioner would suffer any distress by a resumption in surveillance since she is aware that surveillance took place in the past.

¶ 26    On cross-examination, respondent reiterated that he would like the order of protection lifted so that he would have the ability to hire a private detective to investigate the issue of cohabitation should he so elect. Respondent explained that during the pre-decree portion of the case he was concerned about adultery and the safety of his children being around Kornick. Respondent stated that he would not hire a private detective for any purpose other than to investigate the issue of cohabitation. Respondent stated that if the order of protection were lifted and he had the ability to hire a private detective, the investigation would be "more limited" and would be restricted to the issue of cohabitation. On redirect examination by petitioner's counsel, respondent testified that it was his understanding of the law that maintenance would terminate if the recipient is cohabitating.

¶ 27    Petitioner testified that when she initially learned that she had been surveilled she became "very anxious" and "nervous." In addition, she could not sleep and had a recurring nightmare of somebody following her all the time. Petitioner talked to her therapist about it and took medication. Petitioner testified that she experienced "a little bit of relief" after the entry of the plenary order of protection, but she still looks around to see if she is being followed. When asked why she wants to extend the order of protection, petitioner responded, "I don't want to live my life in fear and

anxious [*sic*] all the time that he is following me constantly." Petitioner testified that as the hearing on the motion to extend approached, she began to experience a lot of anxiety, she has been unable to sleep, she has recurring dreams of someone following her, and she is fearful of having to live the rest of her life being surveilled. Petitioner takes Xanax every night to help her sleep. Petitioner testified that she has been seeing a psychiatrist since 1996. She typically sees the psychiatrist once a month, but the frequency of her visits has increased to once a week because of the stress she is experiencing. Petitioner testified that she is also being treated for depression and takes Celexa for that condition and her anxiety.

¶ 28    Petitioner described Kornick as her boyfriend. She sees Kornick every other weekend and "[o]nce a while" during the week. Kornick resides in an apartment in Wheeling. Petitioner did not cosign Kornick's lease, she does not support him, and she sees him "[a] lot less" than she has in the past. When petitioner and Kornick stay together overnight, it is usually at her house and the kids are not there. If the motion to extend were denied, petitioner would be scared that she would not be able to live her life freely without someone following her.

¶ 29    On cross-examination, petitioner testified that she started taking Xanax in 1996. Petitioner understood that if it were established that she cohabitated with Kornick, she would lose her maintenance.

¶ 30    In closing arguments, petitioner's counsel contended that respondent was obsessed with petitioner and would resume surveillance if permitted and that terminating maintenance was "not about the money" to respondent. Counsel further argued that petitioner is "still suffering" and that just the thought that surveillance would resume "is frightening to her." Thus, petitioner's counsel asserted that the "presumption in the law" and the lack of "material changes" compelled granting the motion to extend.

¶ 31    Respondent's counsel argued that the only evidence presented established that an order of protection had been entered and that respondent had complied with the order in the time it has been in place. Respondent argued that the law affords a party the right to surveil for evidence of cohabitation but petitioner was asking that surveillance of her be forever barred. Respondent allowed that surveillance was not the only way to investigate cohabitation, but argued that since the matter was post-decree, he could not obtain financial discovery without a proper pleading yet could not file a viable cohabitation pleading without evidence.

¶ 32    The trial court acknowledged that, in the underlying appeal, this court had not barred respondent entirely from conducting surveillance but had only considered the previous scope and duration. It observed, however, that many litigants cannot afford surveillance so they file cohabitation petitions based on social media, gossip, or other sources and then start discovery. Respondent's counsel responded that under the decision of *In re Marriage of Miller*, 2015 IL App (2d) 140530, a limited investigation would at least be necessary to establish facts sufficient to file a good faith petition. Respondent testified that he did not know if petitioner was cohabitating now and the ability to conduct discovery should not be cut off. To do so would give petitioner a "free pass." If respondent were to file for termination now, petitioner would move for sanctions, arguing that there was no basis for respondent to conduct financial discovery or take Kornick's deposition.

¶ 33    Respondent's attorney posited that if the court granted an indefinite extension, respondent could never engage a private detective to investigate the issue of cohabitation. The court stated it could only grant a two-year extension, to which counsel responded that respondent would face the same situation in another two years regardless of continued compliance. Petitioner's counsel replied that respondent was still motivated by "obsession" and should therefore be limited to facts that cannot be gleaned through an investigation.

¶ 34    On March 5, 2020, the trial court issued its oral ruling. The court stated that it had reviewed the proceedings from the prior order-of-protection hearing and incorporated the record from the original hearing into the hearing on the motion to extend. It said that the burden of proof on an order of protection is a preponderance of the evidence, the Domestic Violence Act is to be liberally construed, and an order of protection may be extended as many times as necessary to prevent abuse and harassment. The court then reviewed the relevant provisions of the Domestic Violence Act, noting that harassment is defined as knowing conduct which is not necessary to accomplish a purpose that is reasonable under the circumstances, would cause a reasonable person emotional distress, and does cause emotional distress to the petitioner. 750 ILCS 60/214 (West 2018). The trial court noted that the prior order of protection hearing established that an unreasonable degree of surveillance had occurred and that the appellate court affirmed the order of protection for that reason. The court then summarized the parties' testimony. The court noted that respondent testified that since the entry of the order of protection, he has not surveilled petitioner and he has not violated the order of protection. Respondent stated that his primary reason for objecting to the extension was his belief that he has a right to surveil petitioner to prove a cohabitation claim. Respondent testified that getting his FOID card back was also a reason for objecting, but not the "pressing" reason. Respondent said he did not know if petitioner was cohabiting at present and opined that petitioner would not suffer from any emotional distress from additional surveillance. The court then summarized petitioner's testimony about her emotions at the thought of being subject to surveillance and found it credible.

¶ 35    The court next discussed that there are methods aside from surveillance to gather evidence of cohabitation, including observation by third persons and references in social media. Based on respondent's demeanor, tone of voice, and suspicions, the court did not find credible respondent's

testimony that it would be difficult for him to decide whether to use surveillance. The court believed that respondent would immediately begin surveilling petitioner if the order of protection were lifted. The court added that it was "troubled" by respondent's belief that reinstatement of the right to investigate would not cause petitioner emotional distress. Moreover, the court found that respondent has the means to pay for the surveillance and that he has the motivation to surveil given that he is paying petitioner monthly maintenance of $65,000. The court remarked that once it "lifts the floodgates, it can't stop the flood." The court then stated:

> "In the context of this case the Appellate Court has found that [respondent's] prior acts of surveillance constituted harassment as that term is defined by the Domestic Violence Act. The Appellate Court further found that past acts of surveillance caused [petitioner] to suffer emotional distress.
>
> [Respondent] has shown in the past that his desire to satisfy his suspicion of cohabitation will cross the line to harassment. And based upon his testimony of the hearing this Court finds that it is more probable than not he will do so again if it lifts the restriction.
>
> The Court finds by a preponderance of the evidence that [petitioner] has satisfied the elements of Section 219 and 214 of the Domestic Violence Act and that she has shown good cause for an extension. For this reason the Court extends the Plenary Order of Protection by two years."

A written order extending the order of protection was entered on March 5, 2020. Respondent filed a notice of interlocutory appeal on April 29, 2020.

¶ 36                                   II. ANALYSIS

¶ 37    On appeal, respondent argues that the trial court's decision to extend the original order of protection for an additional two years "was contrary to the manifest weight of the evidence and an

abuse of discretion" because, among other things, petitioner failed to establish "good cause" for the extension. To place the details of respondent's argument in context, it is necessary to review the relevant provisions of the applicable statute, the Domestic Violence Act (750 ILCS 60/101 *et seq*. (West 2018)).

¶ 38    The Domestic Violence Act is to be liberally construed and applied to advance its underlying purposes, which include "to promote safe and healthy families" by "prevent[ing] abuse and harassment between family or household members." 750 ILCS 60/102 (West 2018); *People v. Leezer*, 387 Ill. App. 3d 446, 449-50 (2008); *Glater v. Fabianich*, 252 Ill. App. 3d 372, 375 (1993). The standard of proof in a proceeding to obtain an order of protection is proof by a preponderance of the evidence. 750 ILCS 60/205(a) (West 2018); *Best v. Best*, 223 Ill. 2d 342, 348 (2006); *Stapp v. Jansen*, 2013 IL App (4th) 120513, ¶ 15; *In re Marriage of Holtorf*, 397 Ill. App. 3d 805, 808 (2010); *Frank v. Hawkins*, 383 Ill. App. 3d 799, 812 (2008). "A preponderance of the evidence is evidence that renders a fact more likely than not." *People v. Uridales*, 225 Ill. 2d 354, 430 (2007); *Wells Fargo Bank, N.A. v. Hansen*, 2016 IL App (1st) 143720, ¶ 17. When the trial court makes a finding by a preponderance of the evidence, a reviewing court will overturn the trial court's finding only if it is against the manifest weight of the evidence. *Best*, 223 Ill. 2d at 348-49; *Stapp*, 2013 IL App (4th) 120513, ¶ 16.[2] A finding is against the manifest weight of the evidence only if an opposite conclusion is clearly apparent or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented.  *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶

---

[2] In *Best*, the supreme court clarified that the manifest-weight-of-the-evidence standard, not the abuse-of-discretion standard, applies to findings of abuse made under the Domestic Violence Act. *Best*, 223 Ill. 2d at 348-350.

44.

¶ 39    The Domestic Violence Act provides for three types of orders of protection—emergency (750 ILCS 60/217 (West 2018)), interim (750 ILCS 60/218 (West 2018)), and plenary (750 ILCS 60/219 (West 2018))—as well as various types of remedies (750 ILCS 60/214 (West 2018)). Section 219 of the Domestic Violence Act provides that a plenary order of protection, the type involved here, "shall issue" if the petitioner has, among other things, satisfied the requirements of section 214 of the Domestic Violence Act. 750 ILCS 60/219 (West 2018). In turn, section 214 of the Domestic Violence Act provides that "[i]f the court finds that petitioner has been abused by a family or household member *** an order of protection prohibiting the abuse *** shall issue." 750 ILCS 60/214 (West 2018). The Domestic Violence Act defines "abuse" as "physical abuse, harassment, intimidation of a dependent, interference with personal liberty or willful deprivation but does not include reasonable direction of a minor child by a parent or person in loco parentis." 750 ILCS 60/103(1) (West 2018). The Domestic Violence Act defines "harassment" as "knowing conduct which is not necessary to accomplish a purpose that is reasonable under the circumstance; would cause a reasonable person emotional distress; and does cause emotional distress to the petitioner." 750 ILCS 60/103(7) (West 2018). Certain types of conduct are presumed to cause emotional distress unless rebutted by a preponderance of the evidence, including "repeatedly following petitioner about in a public place or places" and "repeatedly keeping petitioner under surveillance by remaining outside his or her home, school, place of employment, vehicle or other place occupied by petitioner or by peering in petitioner's windows." 750 ILCS 60/103(7) (West 2018).

¶ 40    As noted above, in this case, Judge Salvi entered a two-year plenary order of protection against respondent on September 6, 2017, which prohibited him "from further acts/threats of

abuse" on petitioner and specifically enjoined respondent "from engaging in surveillance of the Petitioner, either personally or through his agents, assigns, or any other person or company on his behalf." On direct appeal, we affirmed the trial court's decision. *Goodman*, 2019 IL App (2d) 170621-U, ¶¶ 166-171. Prior to the expiration of the plenary order of protection, petitioner sought an extension.

¶ 41     Section 214(a) of the Domestic Violence Act provides that the modification and extension of prior orders of protection "shall be in accordance with this Act." 750 ILCS 60/214(a) (West 2018). In turn, section 220(e) of the Domestic Violence Act provides:

> "Any emergency, interim or plenary order may be extended one or more times, as required, provided that the requirements of Section 217, 218 or 219, as appropriate, are satisfied. If the motion for extension is uncontested and petitioner seeks no modification of the order, the order may be extended on the basis of petitioner's motion or affidavit stating that there has been no material change in relevant circumstances since entry of the order and stating the reason for the requested extension. An extension of a plenary order of protection may be granted, upon good cause shown, to remain in effect until the order of protection is vacated or modified. Extensions may be granted only in open court and not under the provisions of subsection (c) of section 217, which applies only when the court is unavailable at the close of business or on a court holiday." 750 ILCS 60/220(e) (West 2018).

It is the language of section 220(e), notably whether petitioner established "good cause" for the extension, that is at the heart of the present appeal.

¶ 42     Respondent argues that the trial court's decision to extend the original order of protection for an additional two years "was contrary to the manifest weight of the evidence and an abuse of

discretion" because, among other things, petitioner failed to establish "good cause" for the extension. Specifically, respondent argues that despite the undisputed evidence that he did not violate the original order of protection, threaten to violate the original order of protection, or engage in any other form of conduct that could give rise to relief under the Domestic Violence Act, the trial court extended the order based solely on the record underlying the original order of protection. Respondent contends that by granting an extension in the absence of any new evidence, the trial court rendered the "good cause" requirement meaningless, converted the original order of protection into a lifetime injunction renewable in piecemeal increments, effectively imposed an absolute proscription on lawful, supervised professional surveillance, and impaired his attorneys from providing adequate representation.

¶ 43    Petitioner responds that the trial court's March 5, 2020, ruling extending the original plenary order of protection was not against the manifest weight of the evidence. According to petitioner, nothing in section 220(e) of the Domestic Violence Act requires a violation of an order of protection as the necessary predicate for the extension of an order of protection. Rather, petitioner contends, a trial court can rely on the original plenary order of protection as *the* basis for the extension of an order of protection. Petitioner further posits that respondent's construction of the statute would lead to an absurd result where a petitioner who was threatened with a violation of an order of protection could not receive an extension of it because there was no actual violation of the order. Petitioner also argues that an extension is warranted because the evidence shows that respondent "continues to have the desire to harass [her] and feels he has 'an absolute right' to do so by again having her surveilled." Thus, she reasons, "the trial court did not in any way run afoul of this Court's decision. Instead, the trial judge thoughtfully acted to prevent further abuse and harassment of [petitioner] based upon, among other things, [respondent's] testimony (and

demeanor) as to his state of mind and what he would do *today*." (Emphasis in original.)

¶ 44    To address the parties' arguments, we must initially construe the language of section 220(e) of the Domestic Violence Act. The primary objective of statutory construction is to ascertain and give effect to the intent of the legislature. *State Bank of Cherry v. CGB Enterprises, Inc.*, 2013 IL 113836, ¶ 56. The most reliable indicator of legislative intent is the language of the statute itself, given its plain and ordinary meaning. *State Bank of Cherry*, 2013 IL 113836, ¶ 56. If the statutory language is clear and unambiguous, it must be applied as written, without resorting to further aids of statutory construction. *State Bank of Cherry*, 2013 IL 113836, ¶ 56.  A court may not depart from the plain language of the statute and read into it exceptions, limitations, or conditions that are not consistent with the express legislative intent. *State Bank of Cherry*, 2013 IL 113836, ¶ 56.

¶ 45    The relevant language of section 220(e) provides that:

> "If the motion for extension is uncontested and petitioner seeks no modification of the order, the order may be extended on the basis of petitioner's motion or affidavit stating that there has been no material change in relevant circumstances since entry of the order and stating the reason for the requested extension. An extension of a plenary order of protection may be granted, upon good cause shown, to remain in effect until the order of protection is vacated or modified." 750 ILCS 60/220(e) (West 2018).

Thus, section 220(e) distinguishes a motion for extension that is uncontested and for which the petitioner does not seek a modification of the order of protection from any other motion for an extension. Section 220(e) permits the trial court to grant an extension of a plenary order of protection upon the showing of "good cause" and also provides that the findings in the original order can be the basis for extending the order, but only if the motion to extend is uncontested and the petitioner does not seek a modification of the order. 750 ILCS 60/220(e) (West 2018); *Stapp*,

2013 IL App (4th) 120513, ¶ 15 (noting that the "no material change in circumstances" language in section 220(e) applies only when a petitioner seeks an uncontested extension of an order of protection). The fact that the legislature expressly stated that a petitioner's declarations of no material change in the relevant circumstances since entry of the order could suffice for an extension only if they are "uncontested and petitioner seeks no modification of the order" must mean that the legislature intended that something in addition to the findings in the original order of protection must be established to justify an extension in all other situations. That "something" is a showing of "good cause." With these principles in mind, we address whether the trial court's finding that petitioner in this case established good cause to support an extension of the original order of protection was against the manifest weight of the evidence.

¶ 46      Here, the motion to extend the plenary order of protection was contested. Thus, petitioner was required to show more than just unchanged circumstances since the original order was granted. 750 ILCS 60/220(e) (West 2018); *Stapp*, 2013 IL App (4th) 120513, ¶ 15. She was required to establish, by a preponderance of the evidence, "good cause" to extend the order of protection. 750 ILCS 60/220(e) (West 2018). In her motion to extend, petitioner asserted that an extension of the plenary order of protection was warranted "[b]ased upon [respondent's] *continuing* hostility and belligerence towards [her], as well as his *unabated* 'obsession' with her." (Emphasis added.) But petitioner failed to present any evidence at the hearing on her motion to extend to support these allegations. Surveillance had been discontinued in April 2017 by agreement of the parties prior to the trial on the merits in the dissolution proceeding and several months before the hearing on the original order of protection. It was undisputed that since that time, neither respondent, his attorneys, nor any other agent of respondent violated or threatened to violate the original order of protection. Moreover, petitioner produced no evidence of any other arguable harassment by

respondent, *e.g.*, threats, confrontations, or interference, during the entire multi-year proceedings and up to the hearing on the motion to extend.

¶ 47    The only relevant new evidence petitioner elicited was respondent's testimony that he would surveil petitioner again to investigate cohabitation based on the advice of legal counsel and petitioner's testimony that she was fearful of the resumption of surveillance. Neither of these established good cause for the extension. First, although we concluded in the first appeal that it was not contrary to the manifest weight of the evidence for Judge Salvi to find the duration and scope of the surveillance was unreasonable or that the conduct at issue caused petitioner emotional distress, we did not hold that surveillance can never occur. *Goodman*, 2019 IL App (2d) 170621-U, ¶¶ 167, 169. Rather, we allowed that a party may engage a private investigator to gather evidence relevant to a divorce proceeding so long as the investigation serves a purpose that is reasonable under the circumstances. *Goodman*, 2019 IL App (2d) 170621-U, ¶ 169. Under Illinois law, the obligation to pay future maintenance is terminated if the party receiving maintenance "cohabits with another person on a resident, continuing conjugal basis." 750 ILCS 5/510(c) (West 2018). The burden of establishing cohabitation rests on the party seeking to terminate the maintenance obligation. *In re Marriage of Walther*, 2018 IL App (3d) 170289, ¶ 25. Among the factors a court examines to determine whether cohabitation exists include the length of the relationship, the amount of time the couple spends together, the nature of activities engaged in, the interrelation of their personal affairs, whether they vacation together, and whether they spend holidays together. *Miller*, 2015 IL App (2d) 140530, ¶ 40; *Snow v. Snow*, 322 Ill. App. 3d 953, 956 (2001). Although the trial court acknowledged that surveillance is permitted, it indicated that there are other methods, aside from surveillance, to gather evidence of cohabitation. Yet, we perceive no reason why a party should be barred from conducting surveillance to gather evidence

of cohabitation so long as it is within the bounds of reasonableness. Indeed, Illinois courts regularly review evidence from private investigators in cohabitation cases. See, *e.g.*, *In re Marriage of Churchill*, 2019 IL App (3d) 180208; *In re Marriage of Susan*, 367 Ill. App. 3d 926 (2006); *In re Marriage of Sunday*, 354 Ill. App. 3d 184 (2004); *In re Marriage of Johnson*, 215 Ill. App. 3d 174 (1991).

¶ 48    Although Judge Christensen found that "it is more probable than not" that respondent would "cross the line to harassment" if the order of protection were lifted, there was no evidence to substantiate this finding. *In re Marriage of Healy*, 263 Ill. App. 3d 596, 600-01 (1994) (holding that while the Domestic Violence Act is to be liberally construed to protect victims of domestic violence, there must be some evidence in the record to support the relief requested). Petitioner did not present any evidence to support the conclusion that if surveillance resumed, its scope and duration would be excessive or even at the same degree as the pretrial surveillance. Respondent said nothing at the extension hearing to support such a theory, and he did nothing following entry of the order of protection to support such an inference. To the contrary, respondent testified that if the order of protection were lifted and he had the ability to hire a private detective, the investigation would be "more limited," restricted to the issue of cohabitation, and based on the advice of legal counsel. Moreover, respondent has demonstrated that he will follow court directives as evidenced by the fact that he has complied with the original order of protection and he is on notice from this court as to how much surveillance is too much. Thus, the trial court's finding was based upon speculation as to what respondent might do in the future. But court decisions may not be based on speculation or conjecture. *Wall v. McGavock*, 132 Ill. App. 2d 231, 233 (1971).

¶ 49    Second, a petitioner's fear alone, with no other supporting facts, is not sufficient to warrant the extension of an order of protection. See *Kennedy v. Morgan*, 726 S.E. 2d 193, 197 (N.C. App.

2012) (quoting N.C. Gen. Stat. § 14-277.3A(b)(2)) (observing that while "a person may not appreciate being subjected to surveillance by a [private-investigative] service, surveillance in and of itself, if properly conducted *** does not support a finding of 'harassment' with no 'legitimate purpose.' "); *Odden v. Rath*, 730 N.W. 2d 590, 596 (N.D. 2007) (holding that while a petitioner's fear alone is not enough to justify the extension of an order of protection, the petitioner presented additional evidence beyond her testimony about her continuing fear of her ex-boyfriend). Indeed, petitioner admitted that the therapy and medications she cited for proof of her emotional distress had predated discovery of the surveillance by almost 20 years.

¶ 50    Petitioner insists that such an interpretation of section 220(e) results in an "absurd construction" of the statute because it means "if a case presents 'unchanged circumstances,' there can be no extension of the order of protection." Petitioner cites *Stapp*, 2013 IL App (4th) 120513, in support of her position. In *Stapp*, the trial court issued a plenary order of protection against the respondent relating to allegations that he was harassing and stalking the petitioner. Prior to the expiration of the order, the petitioner filed a motion to extend the order. At the hearing on the motion, the petitioner testified that the respondent had contacted her numerous times on the internet while the plenary order of protection was in effect. The respondent denied the petitioner's allegations. At the conclusion of the hearing, the trial court found that the petitioner had proven by a preponderance of the evidence that the respondent had made multiple attempts to contact her while the plenary order of protection was in effect, that the respondent's attempts to contact the petitioner violated the restrictions in the plenary order of protection, and that the petitioner had shown good cause for an extension. The respondent appealed, arguing that the evidence was insufficient to support a finding that he made multiple attempts to contact the petitioner. The appellate court disagreed. The *Stapp* court initially noted that an original order of protection can

be the basis for extending a plenary order only if the motion to extend is uncontested and the petitioner does not seek a modification of the order. *Stapp*, 2013 IL App (4th) 120513, ¶ 15 ("We note both the court and counsel referred to the language 'no material change in circumstances has occurred since the entry of the order.' However, this language applies when petitioner seeks an uncontested extension of the order and allows the court to extend the order without the necessity of testimony. It has no application to the situation here because the extension was contested."). The court then observed that the parties presented conflicting testimony regarding whether the respondent contacted the petitioner, the resolution of such conflicts falls within the purview of the trier of fact, the trial court resolved the conflict in the petitioner's favor, and the evidence was sufficient to support the trial court's finding. *Stapp*, 2013 IL App (4th) 120513, ¶¶ 17-20.

¶ 51    Petitioner asserts that in *Stapp*, the "unchanged circumstances" were that the respondent continued to harass the petitioner. In other words, petitioner's interpretation of unchanged circumstances is that the offending conduct that gave rise to the expired order of protection has continued. But this is simply another way of saying that the petitioner in *Stapp* established "good cause" due to a violation of the original order of protection. In other words, the violation of the order of protection in *Stapp* constituted "good cause" to extend the order. This factor clearly distinguishes *Stapp* from the present case.

¶ 52    Citing to *Lutz v. Lutz*, 313 Ill. App. 3d 286 (2000), petitioner also suggests that the trial court was entitled to rely solely on the record underlying the original order of protection in granting the extension. In *Lutz*, the parties agreed to a plenary order of protection for a period of one year. The agreement was memorialized in a docket entry in the court's file. Prior to the expiration of the order, the petitioner filed a motion to modify, which the trial court treated as a motion to extend. At the hearing on the motion, the petitioner testified that the respondent had violated the original

order of protection and that she continued to fear the respondent. At the conclusion of the hearing, the trial court extended the order or protection, finding that the respondent's conduct constituted abuse and that no material change in circumstances had occurred since the entry of the original order of protection. On appeal, the respondent argued, *inter alia*, that the evidence was insufficient to support an extension of the order of protection because, although he "agreed" to the plenary order of protection, he did not stipulate to a factual basis of abuse. The *Lutz* court stated that section 220(e) of the Domestic Violence Act "provides a plenary order of protection may be extended on the basis of petitioner's motion or affidavit stating no material change in circumstance has occurred since the entry of the order." *Lutz*, 313 Ill. App. 3d at 289 (citing 750 ILCS 60/220(e) (West 1998)). The *Lutz* court then stated:

"We reject [the] respondent's interpretation of the initial order. Further, we find no abuse of discretion and presume, as did the trial court, the original order of protection was properly entered upon a sufficient factual basis. Here, the trial court relied on the original plenary order of protection as the basis for the extension. We acknowledge the written order did not contain express findings. However, the parties' consent to the original order of protection essentially conceded the factual basis necessary to support that order. Moreover, evidence of [the] respondent's alleged violation of the original order lends further evidentiary support for the trial court's determination to extend that order. Accordingly, we find no abuse of discretion by the trial court on this point." *Lutz*, 313 Ill. App. 3d at 289.

¶ 53    According to petitioner, nothing in *Lutz* required a violation of the original order of protection. To the contrary, petitioner asserts that *Lutz* held that a " 'trial court [can] rel[y] on the original plenary order of protection as *the* basis for the extension.' " (Emphasis added by

petitioner.) We find petitioner's reliance on *Lutz* misplaced for multiple reasons. First, although section 220(e) provides that an order of protection "may be extended on the basis of petitioner's verified motion or affidavit stating that there has been no material change in relevant circumstances since the entry of the order," the *Lutz* court does not reference the language providing that an extension may be granted under such conditions only if the motion for extension is uncontested and the petitioner seeks no modification in the order. 750 ILCS 60/220(e) (West 1998). Second, although the *Lutz* court affirmed the decision of the trial court, it did not hold that that reliance on the original plenary order of protection was sufficient, in and of itself, to support the extension of such an order. Indeed, the court stressed that evidence of the respondent's violation of the original order of protection "len[t] further evidentiary support" for the trial court's determination to extend the order. Third, at the time *Lutz* was decided, section 220(e) did *not* contain the "good cause shown" language at issue in this dispute. See P.A. 95-886, § 10 (eff. Jan. 1, 2009) (amending 750 ILCS 60/220(e) to add the sentence, "An extension of a plenary order of protection may be granted, upon good cause shown, to remain in effect until the order of protection is vacated or modified."). Because of these differences, petitioner's reliance on *Lutz* for the proposition that a trial court can rely on the original plenary order of protection as *the* basis for the extension is dubious at best.

¶ 54     In so holding, we do not intend to imply that the record underlying the original order of protection is immaterial to a decision whether to extend an order of protection. To the contrary, the Domestic Violence Act instructs that the context and history of the parties' relationship is a relevant factor to consider when issuing an order of protection. See 750 ILCS 60/214(c)(1)(i) (West 2018) (requiring the trial court to consider "past abuse" as a relevant factor in determining whether to grant a specific remedy). But the circumstances underlying the existence of a prior order, in and of itself, cannot dictate the outcome of a later dispute between the same parties. In

other words, that the record underlying the original order of proceeding was relevant does not mean that it is dispositive, especially given the language of section 220(e).

¶ 55    Noting that respondent "has the motivation to surveil in that he is paying $65,000 per month in maintenance," the trial court expressed concern that once it "lifts the floodgates, it can't stop the flood." This was apparently a reference to its belief that if it allowed the order of protection to lapse, respondent would resume surveillance. The court's remarks are problematic for various reasons. First, as noted above, although we found that the trial court's determination that respondent's prior surveillance constituted harassment as that term is defined in the Domestic Violence Act was not against the manifest weight of the evidence, we did not bar surveillance outright. *Goodman*, 2019 IL App (2d) 170621-U, ¶¶ 167, 169. We simply concluded that the prior acts of surveillance did not serve a purpose that is reasonable under the circumstances considering its duration and scope. *Goodman*, 2019 IL App (2d) 170621-U, ¶ 169. Second, there is nothing barring petitioner from seeking a new order of protection if surveillance resumes and she believes that the degree of surveillance exceeds the bounds of reasonableness.

¶ 56    In short, while we are not unsympathetic to petitioner's concerns, we are compelled to conclude that a plain reading of section 220(e) of the Domestic Violence Act requires something beyond recycling the facts underlying the original order of protection to establish "good cause" for an extension. In this case, petitioner's motion to extend, supported only by the record underlying the original order of protection, respondent's testimony that he would surveil petitioner again to investigate cohabitation based on the advice of legal counsel, and petitioner's testimony that she was fearful of the resumption of surveillance, did not rise to the level of "good cause" sufficient to extend the original order of protection. Indeed, as the trial court recognized, surveillance, in and of itself, is not improper. This is particularly true when the surveillance is related to lawfully

investigating cohabitation. As such, we conclude that the trial court's decision to extend the original order of protection was against the manifest weight of the evidence.

¶ 57                              III. CONCLUSION

¶ 58     For the reasons set forth above, we reverse the judgment of the circuit court of Lake County granting petitioner's motion to extend and vacate the order extending the original order of protection for an additional two years. Nothing in our decision should be construed as barring petitioner from seeking a new order of protection if surveillance resumes and she believes that the degree of surveillance exceeds the bounds of reasonableness.

¶ 59     Reversed and vacated.