2024 IL App (3d) 230151

Opinion filed January 9, 2024

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| DEVON E. SAUNDERS, | ) | Will County, Illinois, |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | Appeal No. 3-23-0151 |
| and | ) | Circuit No. 13-D-1204 |
| | ) | |
| CHRISTOPHER W. SAUNDERS, | ) | Honorable |
| | ) | David Garcia, |
| Respondent-Appellee. | ) | Judge, Presiding. |

JUSTICE DAVENPORT delivered the judgment of the court, with opinion.
Presiding Justice McDade and Justice Albrecht concurred in the judgment and opinion.

**OPINION**

¶ 1    Respondent, Christopher Saunders, filed a petition to terminate maintenance, alleging petitioner, Devon Saunders, was engaged in a resident continuing conjugal relationship with another man. After a two-day bench trial, the court granted Christopher's petition, finding Devon engaged in a *de facto* marriage and terminated maintenance, retroactive to the filing of the petition to terminate. Devon appeals. We hold the trial court's finding of a *de facto* marriage as opposed to an intimate dating relationship was against the manifest weight of the evidence. Therefore, we reverse.

¶ 2                                    I. BACKGROUND

¶ 3          The parties were married for almost 23 years. They have two adult children. On October

8, 2015, the trial court entered a judgment for dissolution of marriage incorporating the parties'

marital settlement agreement (MSA). According to the MSA:

> "The Husband shall pay to Wife as and for maintenance the sum of $3,600.00 per
>
> month for a period of twelve (12) years, terminable at the end of the twelve (12)
>
> years. Said payments are to commence immediately upon entry of the Judgment for
>
> Dissolution of marriage herein; an immediate Order of Withholding to issue.
>
> Maintenance shall be included as taxable income for the Wife and is tax deductible
>
> to Husband. Maintenance for the Wife is modifiable and/or terminable pursuant to
>
> the occurrence of one or more of the following to happen: (1) remarriage of Wife;
>
> (2) death of Wife or Husband; (3) the Wife residing with an unrelated person on a
>
> continuing conjugal basis; and (4) a substantial change in the circumstances of
>
> either party pursuant to 750 ILCS 5/504 and 5/510 and the case law associated with
>
> the same after proper notice and motion and hearing, if necessary."

The maintenance termination date is October 8, 2027; Devon will be 64 years old. During the

hearing, Devon testified she understood the right to maintenance can terminate sooner than 12

years due to her remarriage, the death of either party, or if she lives with someone on a continuing

conjugal basis. Christopher testified he agreed to pay a higher amount in maintenance for a fixed

period of time in exchange for a termination date.

¶ 4          Christopher filed a petition to terminate maintenance on August 26, 2021, alleging Devon

engaged in a resident continuing conjugal relationship with Rodney "Sonny" Vortanz. The trial

took place on March 13 and 14, 2023.

¶ 5    Brad Weaver, a private investigator, testified Christopher retained him in April 2021. He observed Sonny's house and Devon's house 21 times total in April through July 2021, during the late night or very early morning hours. Weaver's activity notes and 46 photos from his surveillance were admitted into evidence. He went to Sonny's house in Plainfield five times and never witnessed Sonny's vehicle there. But Sonny has a garage, and Weaver only saw the garage open once. Devon later testified that Sonny's car was in fact outside his home in some of the private investigator's photos. Weaver did not observe Devon or anything belonging to her at Sonny's address. Sonny's vehicle was outside Devon's house when he observed in the evenings. At times Weaver stayed at Devon's residence, observing Sonny's vehicle for hours, but omitted this observation from his notes. Weaver never observed Sonny's vehicle at Devon's home for an entire night, and he never observed it there at normal waking hours.

¶ 6    Christopher testified briefly. He is in a relationship and lives with his girlfriend. While married to Devon, they would very consistently go to Iowa for holidays and spend time together with friends. At the close of Christopher's case-in-chief, Devon asked for a directed finding, arguing Christopher did not meet his burden to terminate maintenance. The court denied Devon's motion.

¶ 7    Devon was called as a witness by both Christopher and on her own behalf. For the sake of simplicity, we recite facts from her combined testimony here. Devon started dating Sonny exclusively from December 2019 to March 2020, then again from October 2020 to January 2022. They exchanged gifts and celebrated some holidays together, but not all holidays. She never celebrated any Serbian holidays with Sonny, who is Serbian. She met Sonny's distant relatives but not his close relatives. Devon never met Sonny's father, who lived next door to Sonny. But she did meet all of Sonny's children. They went on one vacation to Florida together from February 28

to March 3, 2020, and went to Iowa to see Devon's family approximately four times. They also traveled separately. Devon took "girls' trips" where Sonny was not invited. During these trips without Sonny, her friend Deborah would take care of her pet cat, not Sonny, because "they did not have that kind of relationship."

¶ 8     Sonny regularly posted about their relationship on Facebook, and 160 photos and screenshots were admitted into evidence. Many of these photos and Sonny's posts consisted of the two of them together with friends and dining in restaurants. Devon testified about the activities the two would do together. She met people through Sonny and became friends with his friends. They would go on group dates and celebrate holidays with these friends. Devon and Sonny rented a motorcycle four times to take day trips together. They would stay the night together at a friend's home if they were drinking. Devon's daughter met Sonny twice briefly when Sonny came to pick Devon up for a date, and her son never met Sonny. Only one of Devon's friends met Sonny, and it was only once.

¶ 9     Sonny would spend the night at Devon's house two or three times per week. He never lived in her home and never spent more than four consecutive days in her home. He never came over straight from work and never came over without making prior plans to come over. During their entire relationship, Devon only went to Sonny's house in Plainfield two or three times and only spent one overnight there. Sonny moved to Itasca, and she visited him there six times. Sonny and Devon never worked out together, never did chores together, and did not frequently have dinner together on weeknights. Sonny never shoveled snow at her home or mowed the grass, but Devon's homeowner association handles these activities. Sonny never drove Devon's car without her, never put gas in her car, and never took her car for maintenance. She never wanted to marry Sonny and

did not trust him. Sonny kept, at most, a pair of shorts at her home, and he did not have a drawer there.

¶ 10     Sonny and Devon did not have keys to each other's homes, did not use each other's credit cards, did not commingle finances, did not name each other as beneficiaries on any account, and did not pay for any expenses for the other's home. Devon only considered Sonny as a fun boyfriend, not a part of her family. Devon was monogamous during the relationship, but she never wanted to marry Sonny, stating she did not believe he was of sound character, she did not trust him, and she did not like that he maintained connections with his ex-girlfriend. Sonny paid for most things when they went out together because he was "chivalrous." They began drifting apart before ending their relationship, and his move to Itasca exacerbated that emotional distance. Sonny married his ex-girlfriend in February 2022, less than two months after his relationship with Devon ended.

¶ 11     Deborah Barnat testified she is best friends with Devon and has known her for 17 years. She never met Sonny even though she asked to meet him. She never believed Sonny was living at Devon's house, and she never saw any of his belongings at Devon's house. She would take care of Devon's cat when Devon was out of town. While Devon and Christopher were married, she only met Christopher twice. She opined the relationship between Devon and Sonny did not seem substantial, but she did not express her concerns about the relationship to Devon.

¶ 12     Neither party called Sonny as a witness.

¶ 13     In its oral ruling, the trial court "found this case pretty tough to decide." In relying on the six factors listed in *In re Marriage of Herrin*, 262 Ill. App. 3d 573, 577 (1994), the trial court found the relationship between Devon and Sonny was a *de facto* marriage and terminated maintenance. In its written order, the court found Devon had "engage[d] in a resident, continuing conjugal

5

relationship, and thus her maintenance is terminated, effective and retroactive to August 26, 2021, the date of the filing of the petition to terminate." Devon appeals.

¶ 14                                    II. ANALYSIS

¶ 15        The only issue on appeal[1] is whether the court's finding that Devon engaged in a *de facto* marriage with Sonny, thus terminating maintenance, was against the manifest weight of the evidence.

¶ 16                                 A. Standard of Review

¶ 17        In a dissolution of marriage proceeding, the court may award maintenance to either spouse. 750 ILCS 5/504(a) (West 2022). The parties may enter into a settlement agreement regarding maintenance. *Id.* § 502(a). As incorporated in the parties' MSA, maintenance will be terminated when, among other conditions, "the party receiving maintenance cohabits with another person on a resident, continuing conjugal basis." *Id.* § 510(c). The party seeking termination must show by a preponderance of the evidence that "a *de facto* husband-and-wife relationship exists." *Herrin*, 262 Ill. App. 3d at 576; see *In re Marriage of Stockton*, 401 Ill. App. 3d 1064, 1069 (2010). It is not sufficient to show an intimate dating relationship. *In re Marriage of Miller*, 2015 IL App (2d) 140530, ¶ 51.

¶ 18        We will not disturb a trial court's finding that a *de facto* husband-and-wife relationship exists unless that finding is against the manifest weight of the evidence. *In re Marriage of Susan*, 367 Ill. App. 3d 926, 929-30 (2006). A decision is against the manifest weight of the evidence

---

[1]Devon initially raised two issues on appeal, the second issue alleging the court erred when it denied her motion for directed finding at the close of Christopher's case. She conceded in her reply brief that she waived review of the issue when she proceeded to present evidence in support of her defense after the motion was denied, and she therefore withdrew her argument. See 735 ILCS 5/2-1110 (West 2022).

when "the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *In re Marriage of Trapkus*, 2022 IL App (3d) 190631, ¶ 42.

¶ 19                                      B. Dating Relationship or *De Facto* Marriage

¶ 20          In determining whether the petitioner has met his or her burden showing a *de facto* marriage exists, a court must evaluate the totality of the circumstances, considering the following nonexhaustive list of factors: (1) the length of the relationship, (2) the amount of time spent together, (3) the nature of activities engaged in, (4) the interrelation of personal affairs (including finances), (5) whether they vacation together, and (6) whether they spend holidays together. *Miller*, 2015 IL App (2d) 140530, ¶ 40. "Each termination case turns on its own set of facts; just as no two relationships are alike, no two cases are alike." *Id.* Thus,

> "[t]he six factors are not a checklist. Searching the evidence to find facts to assign to each of the six factors does not establish that a relationship rises to the level of a *de facto* marriage where those facts lack depth and seriousness. *** [C]ourts should be mindful that the circumstances of an intimate dating relationship are also likely to involve facts that fit into each of the six factors, such that those facts in their totality must attain a certain gravitas to establish a *de facto* marriage." *Id.* ¶ 46.

It was Christopher's burden to establish Devon and Sonny were involved in a *de facto* husband-and-wife relationship, not just an intimate dating relationship. In its oral ruling, the court addressed facts that fit within the six factors, but it did not state the weight it gave to each factor. We now address each factor, beginning with the factors we find most compelling.

¶ 21                                      1. *Interrelation of Personal Affairs*

¶ 22          Devon's testimony reflects no interrelation of their personal affairs. Devon and Sonny maintained separate homes. They did not have keys to the other's home. They did not use each

7

other's credit cards and never commingled finances. They did not name each other as beneficiaries on any account. They did not go to doctor appointments together or buy any joint gifts for their friends. Sonny never paid any expenses for Devon's home, and she never paid any expenses for Sonny's home. Although Devon met Sonny's children and distant family, she never met his father, who lived next door to Sonny in Plainfield. Sonny met some of Devon's family in Iowa and briefly met her daughter twice, but he never met Devon's son or most of Devon's friends. Devon never asked Sonny to watch her cat when she went on vacation, because "they did not have that kind of relationship." Sonny did not come to her house without making prior arrangements. He did not drive her car without her, take it for maintenance, or put gas in the car. He did not assist when she bought a new car. Sonny usually paid when the two went out, but Devon explained it was due to chivalry. When Devon returned home from visiting her son out of state, Sonny did not pick her up from the airport, and she instead took an Uber home. Sonny never lived in Devon's home, and she never asked him to live in her home. He never spent more than four consecutive days in her home and usually stayed overnight two or three days per week. Before Sonny moved to Itasca, she was not even aware he was attempting to rent out his Plainfield home. Devon was never engaged to Sonny, and she never wanted to marry him. She described her relationship with Sonny as "volatile but fun" and never considered him a part of her family.

¶ 23    The court found there was a lot of testimony of Sonny going to Iowa, where Devon's mother lived, "a lot of which you don't necessarily see *** in a dating relationship." The court noted, "they didn't intertwine their financials, that he didn't pay anything for her other than dinner. He always picked up the tab. I didn't hear her saying anything that she picked up the tab at all at any time." Here, the court considered the fact the two did not intertwine their financials but still found a *de facto* marriage existed.

8

¶ 24　　The totality of the circumstances here show Devon and Sonny did not interrelate their personal affairs. They lived separate lives and maintained separate households, coming together when going out as a couple. Although Sonny went to Iowa a few times, the record establishes the two did not enmesh their day-to-day lives and shared no commitments. The clear divide in Devon and Sonny's personal affairs highlights their choice for dating-style autonomy over marital-like interdependence. This factor did not weigh in favor of a *de facto* marriage but instead an intimate dating relationship.

¶ 25　　　　　　　　　　　　2. *Nature of Activities*

¶ 26　　Devon testified about going out with Sonny to restaurants, concerts, and parties with friends. Devon and Sonny rented a motorcycle and took four day trips. They had a boating day with friends. They traveled to Iowa to see her family. The court found "they were constantly going out and having dinner together, being together with friends, doing stuff with—with friends. And usually it was his friends." The court also noted a lot of evidence was from Sonny's Facebook page and Devon did not post on Facebook. But Devon did not object to Sonny posting about their relationship on Facebook. Socializing together frequently and engaging in "such dating activities as dinners, movies, and drinks" have constituted a *de facto* marriage. *Snow v. Snow*, 322 Ill. App. 3d 953, 956 (2001).

¶ 27　　However, Devon also testified that she and Sonny did not do chores together. Sonny never took out the trash, never brought the trash cans in, never shoveled snow, never mowed the lawn, never received mail addressed to him, never grilled, never changed lightbulbs, never moved furniture, and never hung pictures at Devon's home. Sonny never did laundry in her home, and Devon never did Sonny's laundry. He infrequently washed dishes at her home. The lack of shared chores indicates something less than a *de facto* marriage. See *Miller*, 2015 IL App (2d) 140530,

9

¶¶ 44, 69 (no *de facto* marriage where the parties did not share a household or perform household duties together). The nature of the activities Devon and Sonny engaged in demonstrate the fun, lighthearted side of dating, without the more serious aspects such as household chores that would be present in a serious, committed relationship akin to a husband and wife sharing all aspects of their lives together. When considered as a whole, the nature of activities does not weigh in favor of a *de facto* marriage but instead indicates an intimate dating relationship.

¶ 28                      3. *Length of the Relationship and Amount of Time Spent Together*

¶ 29        Courts have found the existence of a *de facto* marriage based on relationships spanning 1½ years. See *Snow*, 322 Ill. App. 3d at 956. A break in the relationship may not necessarily impact the finding of a *de facto* marriage based on the length of the relationship. See *In re Marriage of Edson*, 2023 IL App (1st) 230236, ¶ 125. Devon testified she dated Sonny from December 2019 to March 2020 and then again from October 2020 to January 2022, for a total of 17 months. The court found "They were dating constantly until the date that they broke up and then they reunited again and then they were together for a while there, too. So they were together for *** a long time, even if you include the break in between."

¶ 30        Devon testified she and Sonny spent time alone together and also together with friends. Sonny would spend two or three overnights at her home, but he also never came over straight from work. They did not frequently have dinner together on weeknights. She only visited his Plainfield home two or three times and visited his Itasca home six times. Although they spent a considerable amount of time together, there is evidence of time spent apart, especially when Devon would travel for girls' trips. Regarding the amount of time spent together during the 17-month long relationship, the court found "a lot of evidence of constant being together dating" and "[t]hey had a lot of activity together." The court explained,

10

"There was [*sic*] notes he was spending a lot of time at her house, but there was never any, that I can remember, any testimony of her going to his house and staying over with him. There—you know, testimony was that they—you know, the private eye would go there and his car would be in there 'til ten, eleven o'clock at night. But the testimony that I heard was that they never went in the morning to see if the car was still here. But, you know, that part of it didn't really matter to me because there were times when they went out of town and stayed together. You know, I didn't hear any—any testimony that—you know, that they were in separate rooms or anything like that."

¶ 31     Devon and Sonny dated for 17 months, which weighs in favor of a finding of a *de facto* marriage. Devon's testimony indicates a substantial amount of time was spent together, which tends to also weigh in favor of a *de facto* marriage. But the length of the relationship and the amount of time spent together, when viewed in light of the other factors, carry little weight. See *Edson*, 2023 IL App (1st) 230236, ¶¶ 125, 133.

¶ 32                              4. *Vacations Together*

¶ 33     Devon testified she went on one short vacation to Florida with Sonny. They traveled to Iowa four times to see her family. Christopher testified he often traveled to Iowa with Devon during their marriage. Devon and Sonny took day trips on the motorcycle four times. But they also took separate vacations. The court stated, "they did, you know, I think one or two vacations together. They had short periods that I don't know if you call them vacation or not where they went away for a day or two." Christopher argues on appeal the reason for their limited number of vacations may be due in part to the pandemic.

11

¶ 34          Short, overnight trips may be evidence of a *de facto* marriage. *In re Marriage of Walther*, 2018 IL App (3d) 170289, ¶ 31. However, in shorter relationships, the fact that a couple vacations together is "reflective of the initial bloom of the relationship [and may] not translate into a *de facto* marriage." *In re Marriage of Churchill*, 2019 IL App (3d) 180208, ¶ 18. This factor may be considered a component of factors three and four and "is not necessarily compelling in establishing a *de facto* marriage." *Edson*, 2023 IL App (1st) 230236, ¶ 173.

¶ 35          If the factors were intended to be a checklist, the fact that Devon and Sonny vacationed together even once would check the box and imply a *de facto* marriage. However, the factors are not intended to be a checklist, and courts must consider whether the vacations taken together demonstrate the permanence and commitment of a *de facto* husband-and-wife relationship. *Miller*, 2015 IL App (2d) 140530, ¶ 46. We find the few, short trips that Devon and Sonny took together over the course of their 17-month relationship reflect "the initial bloom of the relationship" (*Churchill*, 2019 IL App (3d) 180208, ¶ 18) and do not demonstrate the permanence or commitment of a *de facto* marriage, particularly where the two also vacationed separately during the relationship. Accordingly, this factor did not weigh in favor of a *de facto* marriage.

¶ 36                              5. *Holidays Together*

¶ 37          Devon testified the two spent some, but not all, holidays together. The court noted, "they spent holidays together. I mean, that was testified to." This factor, like the vacation factor, may also be considered a subfactor that does not carry as much weight on its own. See *Edson*, 2023 IL App (1st) 230236, ¶ 182 ("At best, [evidence of shared holiday activities] goes to how the two spent their time when they were together, and only slightly suggests a finding of a *de facto* relationship."). Here, the fact that Devon and Sonny did not celebrate all holidays together and

Devon did not celebrate any Serbian holidays is indicative of an intimate dating relationship and falls well short of showing the permanence and commitment of a *de facto* marriage.

¶ 38                                    6. *Other Considerations*

¶ 39          "The six-factor analysis is insufficient to distinguish an intimate dating relationship from a *de facto* marriage if left unaccompanied by an understanding that the facts falling into each category must achieve a gravitas akin to marital behavior." *Miller*, 2015 IL App (2d) 140530, ¶ 60. Marital behavior implies intended permanence, which was not present in this relationship. An important consideration that does not neatly fit in one of the six factors above is the fact that Sonny married someone else less than two months after his relationship with Devon ended. If Devon and Sonny were in a deeply committed relationship on par with a marriage, it defies logic that he would be married to someone else seven weeks later. Moving on quickly from relationships is not unheard of, but Sonny's haste in marrying someone else suggests his relationship with Devon lacked the depth and synergy of a marital bond. Indeed, Devon and Sonny did not have much to untangle after their relationship ended, as they did not share any bank accounts or real estate and did not keep their belongings in the other's home.

¶ 40          Simply put, it was Christopher's burden to prove by a preponderance of the evidence that Sonny and Devon were *de facto* husband and wife, and he did not meet that burden. Based on the totality of the circumstances, it is clearly apparent that Devon and Sonny were involved in an intimate dating relationship that did not achieve the gravitas of a marital relationship. *Id.* Thus, the court's finding of a *de facto* marriage was against the manifest weight of the evidence, and its decision to terminate maintenance was in error.

¶ 41                                    III. CONCLUSION

¶ 42          The judgment of the circuit court of Will County is reversed.

¶ 43        Reversed.

*In re Marriage of Saunders*, 2024 IL App (3d) 230151

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Will County, No. 13-D-1204; the Hon. David Garcia, Judge, presiding. |
| **Attorneys for Appellant:** | Myra A. Foutris, of Foutris Law Office, Ltd., of Chicago, for appellant. |
| **Attorneys for Appellee:** | Gregory B. Jumbeck, of Reich, Jumbeck, Stole & Reeb, LLP, of Joliet, for appellee. |